Chon Lonell JOHNSON *v.* STATE of Arkansas

CA CR 99-1220                                        19 S.W.3d 66

Court of Appeals of Arkansas
Divisions I and II
Opinion delivered June 7, 2000
[Petition for rehearing denied July 26, 2000.* ]

*William R. Simpson, Jr.*, Public Defender; *Andy O. Shaw*, Deputy Public Defender, by: *Deborah R. Sallings*, Deputy Public Defender, for appellant.

*Mark Pryor*, Att'y Gen., by: *James R. Gowen, Jr.*, Ass't Att'y Gen., for appellee.

---

* NEAL and GRIFFEN, JJ., would grant.

SAM BIRD, Judge. Chon Lonell Johnson was convicted in Little Rock Municipal Court of misdemeanor terroristic threatening, resisting arrest, disorderly conduct, and public intoxication. He appealed to circuit court and was convicted of failure to submit to arrest and disorderly conduct, for which he was given probation and fines. On appeal he argues that the evidence was insufficient to support the conviction of disorderly conduct. We affirm.

Two Jacksonville police officers testified at the trial. Officer Mark Swagerty testified that he was patrolling May 1, 1998, about 11:30 p.m., when he saw Johnson standing on the corner. As the police car approached him, Johnson became more and more nervous, started pacing, and looking back at the patrol unit. When the police car stopped and Swagerty asked Johnson's name, he said Johnson yelled, "Why are you f_ _ _ _ _ _ harassing me?" Officer Swagerty said he did not know Johnson but he had heard of him, and for that reason he called for backup. Swagerty said Johnson smelled of alcohol and was standing in the roadway shouting, cursing, and gesturing in a violent manner.

Officer Thomas Mayberry testified that he knew Johnson and, when he arrived, he immediately began to try to talk Johnson down, hoping to calm him. He said Johnson was flailing his arms around, yelling, and cursing. At one point Johnson took an aggressive stance toward Officer Swagerty, stripped off his shirt, and clenched his fists. Officer Mayberry said he maintained his distance from Johnson because of his prior experiences with him. Two other officers were called to assist.

Mayberry said he was still trying to talk Johnson down, with little success, when Johnson began walking toward a house. Johnson was told to come back to the street, but he kept going. The officers followed, and as soon as Mayberry got close enough, he sprayed Johnson with pepper spray. Johnson then wrapped his arms around a post on the porch, and it took all four officers and hitting Johnson in particularly fleshy-tissue pressure-control spots to make him loosen his grip. The officers finally got Johnson on the ground and handcuffed him.

Johnson testified that he had been visiting his aunt when he got a page from his girlfriend who told him she was stranded on Valentine Road. He said that he had called a taxi, and that when Officer Swagerty first encountered him, he was simply waiting outside his aunt's house for the taxi. Johnson denied that he was

violent, unruly, cursing, belligerent, or that he had tried to flee. He insisted that he spoke calmly to the officers and explained to them that he had an emergency situation with his daughter (earlier he had said his girlfriend) and that he was trying to get to her and help her. During cross-examination, he admitted that he had been convicted during the past ten years of aggravated assault on a police officer.

Johnson's great-aunt testified that it was her house to which Johnson had retreated, that he had been visiting her when he was paged, and that he had immediately called a taxi. She testified that Johnson is partially paralyzed from a previous gunshot wound, and that she tried to get the officers to stop hitting him and let her talk to him, but they would not. They told her to go back inside the house.

The trial court found Johnson guilty of disorderly conduct for cursing the officers in a public place, standing in the street shouting, flailing his arms around, cursing, and yelling, and stripping off his shirt and making a fist while taking an aggressive stance against Officer Swagerty. Arkansas Code Annotated section 5-71-207 (Repl. 1997) provides in pertinent part:

> (a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk thereof, he:

> (1) Engages in fighting or in violent, threatening, or tumultuous behavior; or

> (2) Makes unreasonable or excessive noise; or

> (3) In a public place, uses abusive or obscene language, or makes an obscene gesture, in a manner likely to provoke a violent or disorderly response or....

On appeal, Johnson argues that the evidence was insufficient to support his conviction for disorderly conduct. We find that the evidence is sufficient to support the conviction, and we affirm.

■■ When the sufficiency of the evidence is being challenged on appeal, we review the evidence in the light most favorable to the appellee, considering only that evidence that tends to support the verdict. *Ladwig v. State*, 328 Ark. 241, 943 S.W.2d 571 (1997); *Wilson v. State*, 320 Ark. 707, 898 S.W.2d 469 (1995); *Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). The evidence, whether direct or circumstantial, must be of sufficient force

that it will, with reasonable and material certainty and precision, compel a conclusion one way or another. *Kilpatrick v. State*, 322 Ark. 728, 912 S.W.2d 917 (1995). We do not weigh the evidence on one side against the other; we simply determine whether the evidence in support of the verdict is substantial. *Tisdale v. State*, 311 Ark. 220, 843 S.W.2d 803 (1992); *Salley v. State*, 303 Ark. 278, 796 S.W.2d 335 (1990). Neither do we pass on the credibility of witnesses. That duty is left to the trier of fact. *Mann v. State*, 291 Ark. 4, 722 S.W.2d 268 (1987).

The dissenting opinion strains in its attempt to suggest that the trial court's only basis for finding Johnson guilty on the charge of disorderly conduct was that Johnson cursed the police officers. This suggestion is simply not supported by the record. While it is true that Mayberry testified that the "cursing out loud in the street was the basis of this disorderly conduct charge," in determining Johnson's innocence or guilt on that charge, the court was not obligated to limit its inquiry to only the evidence that, in Officer Mayberry's opinion, was sufficient to charge Johnson with that offense. It is clear from the record that Johnson's crude inquiry to Officer Swagerty during their initial encounter was only a small part of the conduct on Johnson's part that the court considered in determining whether Johnson had committed disorderly conduct. Officer Mayberry testified that when he arrived on the scene, Johnson was "flailing his arms around, yelling, cursing,..." and that while he tried to talk to Johnson in an effort to calm him down, Johnson took off his shirt and clenched his fists, action that he recognized as "preassaultive cues" on Johnson's part. All of this conduct by Johnson can be fairly characterized as conduct that is prohibited by Ark. Code Ann. § 5-71-207 (a)(1), (2), and (3).

When the evidence is considered in the light most favorable to the State, as we are required to do, the officers' testimony supports the trial court's finding that Johnson violated sections one, two, and three, of the disorderly conduct statute, because he engaged in threatening or tumultuous behavior, because he made unreasonable or excessive noise, and because he, in a public place, used abusive or obscene language in a manner likely to provoke a violent or disorderly response.

Affirmed.

KOONCE and STROUD, JJ., agree.

ROBBINS, C.J., concurs.

NEAL and GRIFFEN, JJ., dissent.

JOHN B. ROBBINS, Judge, concurring. I also would affirm appellant's conviction. I believe that the proof recited in the majority opinion, which describes the yelling, cursing, and actions of the appellant, constitutes substantial evidence to support appellant's conviction for disorderly conduct. However, I feel compelled to write this concurring opinion to give some additional response to the dissenting opinion.

While the dissent addresses the merits of the sole issue raised by appellant on appeal and agrees with appellant's argument that the evidence was insufficient to support his conviction, it appears that the major portion of the dissenting opinion advances the proposition that the initial contact by police with appellant, the appellant's arrest, and the charges filed were racist, *i.e.*, that they occurred as the result of racist judgment on the part of the law enforcement officers involved. If I am correct in this observation, I note that the dissent raises an issue not raised by appellant, proceeds to argue the issue for the appellant, and concludes by suggesting surprise and disappointment that the majority of the judges deciding this case will not address the issue raised by the dissenting judges and agree with their presumptions. It would be contrary to well-established rules of appellate review for this court to engage in such a procedure.

Furthermore, in order to create the issue, it was necessary for the dissent to presume that the police officers involved in this incident were white. There is nothing in the record that supports this presumption. While I do not know that the officers were not white, neither do the dissenting judges know that they were. Then, based on this presumption, the dissent presumes that the actions of the police officers were not reasonably responsive or justified by the conduct of appellant, and would not have occurred but for the fact that appellant is black. I submit that a white man who yells and curses at a police officer, and who jerks his shirt off, clenches his fists, and assumes a fighting stance toward the police officer would likely be arrested and charged just as quickly as appellant was.

I do not condone discriminatory conduct by anyone, especially by officers charged with the responsibility of enforcing our laws. While I respect the dissenting judges' sensitivity and zeal, and do not for a moment question that racial equality is a noble cause, I do not believe the thesis they advance is relevant to the argument

advanced by appellant or to the facts presented by the record in this case.

> [A judge] is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness.

> —BENJAMIN N. CARDOZO,
> *The Nature of the Judicial Process* 141 (1921)

*Courts stand ... as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or ... non-conforming victims of prejudice and public excitement.* Chambers v. Florida, 309 U.S. 227 (1940)

WENDELL L. GRIFFIN, Judge, dissenting. By affirming appellant's conviction for disorderly conduct because he used profanity in questioning the validity of a police officer's actions, the majority turns its back on this vision of the judicial function that Justice Hugo Black of the Supreme Court of the United States asserted more than fifty years ago. The majority does so despite a long line of decisions holding that anyone is free to verbally challenge police action. Although the majority properly rejects the State's transparent assertion that appellant's challenge to the sufficiency of the evidence is procedurally barred, its decision to affirm appellant's conviction is reached by what is plainly a *de novo* exercise aimed at upholding a trial court result that cannot be justified according to the proper standard of appellate review. And the majority decision comes in the face of overwhelming evidence that the police based their contact with appellant on a racist judgment that he, a black man, did not belong where a police officer saw him and was not entitled to assert his right to be left alone using profane, yet not incendiary, language. I will not support a result that legitimates double standards in our criminal justice system and adds judicial endorsement to occupation-force police conduct in poor and minority communities. Instead, I would reverse and dismiss the disorderly conduct conviction and hold that the record is insufficient to support it.

## The Facts

On the evening of May 1, 1998, appellant, who is partially paralyzed, visited his great-aunt and uncle who lived at 511 Ray Road in Jacksonville, Arkansas. While there, appellant received a message that his girlfriend was stranded on Valentine Road. So he phoned for a cab, talked with his aunt while he watched the news until sometime between 10:00 and 10:30 p.m., and then stepped

outside his aunt's house to await the cab. Officer Mark Swagerty of the Jacksonville Police Department was patrolling the south end of town and driving in the 500 block of Ray Road when, according to his trial testimony, he

> *noticed a black male standing on the corner of the road, and as I approached him, he was getting real nervous, and started pacing, and looking back and forth at the patrol unit. I got out and asked him his name. He immediately became hostile. The first words out of his mouth were, "Why are you f_ _ _ing harassing me?"* I could smell alcohol on him. He began to walk away. Due to his violent behavior, I called for another officer to come over there, Officer Mayberry. Other than his cursing, just the way his actions were indicated that he had a violent demeanor. The way he was yelling, cursing, his look and attitude toward me. This conduct lasted the whole time during the whole event. Just the smell of alcohol about him and the way he was acting indicated he'd been drinking.

(Emphasis added.)

Officer Thomas Mayberry of the Jacksonville Police Department testified that he responded to assist Swagerty with a

> belligerent individual that he was in contact within the 500 block of Ray Road. As I arrived on the scene, pulled and exited my vehicle, I observed Swagerty's vehicle parked approximately 100 yards away in the roadway. Mr. Johnson and Officer Swagerty were walking towards me with Mr. Johnson in the lead, and Officer Swagerty trailing by about fifteen to twenty feet. Mr. Johnson was flailing his arms around, yelling, cursing, and I identified him by name by calling out to him. I established contact with Mr. Johnson. He was walking towards my unit. I attempted to calm him and find out what the problem was. *His response was that he was being harassed by Officer Swagerty....* Mr. Johnson, during the next few moments, alternately became agitated and calm as I used persuasion talk to try and calm him, talk to him, find out what was going on from his perspective. By persuasive talk, I mean I was simply trying to calm him down, get him to walk to me, explain to me what was going on from his perspective. Basically to quell the disturbance that I was seeing. During the course of our conversation, Mr. Johnson informed me that he was trying to wait for a taxi that he had summoned. I got on the radio to my dispatcher, called them to contact the taxi company and verify Mr. Johnson's account.

(Emphasis added.)

Mayberry testified that the "cursing out loud in the street was the basis of this disorderly conduct charge." And he testified that two other officers also responded "to assist."

> They stood by while I maintained primary contact with Mr. Johnson. At one point Mr. Johnson turned, took a belated stance towards Officer Swagerty, clenched his fist, and then subsequently pulled his shirt off. All of these based upon my training and my prior experience, I recognized as preassaultive cues on Mr. Johnson's part. It is my understanding that that is the basis for the terroristic threatening charge."

Mayberry testified that he continued trying to

> calm Mr. Johnson down while I awaited some verification from our dispatcher and also just to get him to reduce what I perceived as a very agitated state on his part. Mr. Johnson began walking towards the driveway towards the front of the residence at 511 Ray Road. I asked Mr. Johnson to step back down to the side of the street with me and continue talking with me. He continued moving towards the residence and walked up into the carport of the residence. At that time I directed him to come back down to the street, rejoin and talk to me. He did not do so, remained in the carport area ... Once at the carport, although Mr. Johnson does have somewhat limited mobility, he began sprinting across the front porch area, which is a concrete pad about three feet wide and extends across from the carport to the front door of the residence. My concern at that time was that he was fleeing from my presence, and as I was concerned that he might force his way through the door of the residence. In all my dealing with him I've not ever known of him to have any connection to that particular residence. As he came by me, I administered a short burst of OC pepper spray to his face. He continued across the porch to a wrought iron porch post, which is in front of the front door of the residence. Other officers and I converged on him. I grabbed his left arm in an attempt to remove his arm from the post and effect an apprehension. I was not able to pull his hand or his arm loose from the post. Another officer took a position on his right side and was attempting to accomplish the same thing. I felt at that time that it was necessary that I escalate my·level of force to gain his compliance and place ·him in custody. At that time I removed my expandable baton from my belt, extended it, and began using it, making strikes against his left forearm in the fleshy tissue consistent with my training in pressure point control techniques. The purpose of those strikes was to induce a temporary motor dysfunction of the left hand to where he would reduce his grip strength, and I'd be able to remove his hand from the post. After approximately four strikes, that was accomplished. I was able to remove his hand from the

post, and we were able to take Mr. Johnson to the ground and place him in custody. At that point we de-escalated our force, stood him up, noted that his legs were trembling quite a bit. I obtained a patrol vehicle, and rather than forcing him to walk down to the street, I backed a patrol vehicle up into the yard, and we placed him in the patrol vehicle. At that time or shortly after he was placed in custody, two residents of 511 Ray Road stepped out the front door of the house, and I made contact with them. I apologized for the disturbance and explained to them what had taken place. These people were the Thomases. They were the residents of that address, have been for quite some time. No cab driver ever came up to there.

Despite the fact that the Thomases (appellant's great-aunt and uncle) verified that they knew appellant, confirmed that he had visited them that evening, and that he was waiting for a cab, appellant was arrested, charged with disorderly conduct, terroristic threatening, fleeing, resisting arrest, and public intoxication. The charges were tried to the court. At the close of the State's case, appellant's counsel moved for directed verdict on all charges. The State responded by arguing, as to the disorderly conduct charge, that "the Defendant cursed from the outset in public, in the street, late at night." The trial judge ruled, "I'm going to deny the Motion on Disorderly Conduct. Obviously he's cussing." After appellant presented his case, he renewed his motions for directed verdict and argued that the evidence was legally insufficient to support the disorderly conduct charge. The trial judge denied the motions, found appellant guilty of disorderly conduct, and reduced the resisting arrest charge to refusal to submit to arrest. He found appellant not guilty of public intoxication, not guilty of terroristic threatening, and not guilty of fleeing. In announcing his decision finding appellant guilty of disorderly conduct, the trial judge stated that while it was a close case whether the police had probable cause to stop and confront appellant, "even if that's a close issue, I don't believe at that point in time he has the right to cuss the police officer, and it kind of escalated from there." Appellant's challenge to the sufficiency of the evidence to support the disorderly conduct conviction presents a fundamental question: whether the use of profanity in a question to a police officer is enough to establish the crime of disorderly conduct. I would emphatically hold that it is not.

*Appellant's Challenge to the Sufficiency of the Evidence*

The State's proof, the arguments advanced by the prosecutor in response to the directed-verdict motions, and the trial judge's comments in announcing his decision show that appellant's use of profanity was the basis for the disorderly conduct conviction. While there was testimony that appellant clenched his fist and removed his shirt during the encounter with Officers Swagerty and Mayberry, Mayberry testified this conduct was the basis for the terroristic threatening charge. Swagerty testified, however, that appellant's profanity was the basis for the disorderly conduct charge. It is particularly relevant that the only statement that the prosecution proved that appellant made came through Swagerty's testimony that appellant asked, "Why are you f_ _ _ing harassing me?"

Arkansas Code Annotated Section 5-71-207(a)(3) (Repl. 1997) states that a person commits disorderly conduct when he, for "the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk thereof, in a public place, uses abusive or obscene language, ... in a manner likely to provoke a violent or disorderly response." In *Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998), our supreme court held that this statute is not overly broad because it only prohibits fighting words. In that case, the supreme court affirmed Bailey's conviction for disorderly conduct and observed that his use of profanity and racial epithets towards police officers, combined with the threatening behavior of grabbing an officer's arm, was sufficient to sustain his conviction. Bailey was arrested when an officer went to his residence to investigate a one-vehicle accident involving Bailey and his girlfriend near his apartment. When the officer arrived, Bailey began to curse, calling the officer MF or SB when the officer brought Bailey's girlfriend from the residence. At one point during that encounter, Bailey said "F_ _k you, nigger, and f_ _k you, too" to a black state trooper who was assisting with the encounter. The supreme court affirmed Bailey's disorderly conduct conviction based on this record, concluding:

> [n]ot only did Mr. Bailey's [*sic*] direct various fighting words to the officers, when considering his surrounding conduct, such as standing up and grabbing Officer Randle's arm, we conclude that he used these words "in a manner likely to provoke a violent or disorderly response" under § 5-71-207(a)(3). Moreover, his act of standing up and grabbing Officer Randle's arm in and of itself

supported a conviction under subsection (a)(1), as this conduct constituted "threatening behavior."

*Id.* at 54, 972 S.W.2d at 245.

Appellant's case clearly presents no similar conduct or fighting words. The testimony from the State's witnesses, Swagerty and Mayberry, was that appellant was cursing and *walking away* from Swagerty when Mayberry first encountered him. Swagerty testified that Mayberry *asked*, "Why are you f_ _ _ing harassing me?" Aside from the fact that the question appears to have been warranted, albeit crudely posed, neither the question nor the crude language employed in posing it constituted "fighting words." As defined by the United States Court in *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), fighting words are those which "by their every utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572. There was nothing threatening, insulting, or incendiary about the question so as to suggest that it was posed "in a manner likely to provoke a violent or disorderly response." The State never even presented proof to that effect.

The Supreme Court has unequivocally stated that the First Amendment protects a substantial amount of verbal criticism directed toward law enforcement officers. *See City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987). The Court also stated that the freedom to verbally criticize actions by the police without the risk of arrest is one of the primary distinctions between a free nation and a police state. *See id.* The *Hill* Court noted that the freedom to criticize police conduct is rooted in common law, and quoted two cases in support. *See Hill* at n. 12, *citing The King v. Cook*, 11 Ca. Crim. Cas. Ann. 32, 33 (B.C. County Ct. 1906) (stating "in a free country like this citizens are entitled to express their opinions without thereby rendering themselves liable to arrest unless they are inciting others to break the law; and policemen are not exempt from criticism any more than Cabinet Members"); *Ruthenbeck v. First Criminal Judicial Court of Bergen Cty.*, 7 N. J. Misc. 969, 147 A. 625 (1929) (vacating conviction for defendant saying to police officer, "You big muttonhead, do you think you are a czar around here?").

The *Hill* court also noted a *Pennsylvania Law Review* note in which the author stated:

[C]onduct involving only verbal challenge of an officer's authority or criticism of his actions ... operates, of course, to impair the

working efficiency of government agents.... Yet the countervailing danger that would lie in the stifling of all individual power to resist — the danger of an omnipotent, unquestionable officialdom — demands some sacrifice of efficiency ... to the forces of private opposition.... [T]he strongest case for allowing challenge is simply the imponderable risk of abuse — to what extent realized it would never be possible to ascertain — that lies in the state in which no challenge is allowed."

*See Hill,* n. 12 *citing* Note, *Obstructing a Public Police Officer,* 108 U. PA. L. REV. 288, 390-92, 406-07 (1960).

Our supreme court has also recognized that an officer's authority or conduct is not unfettered, as reflected by Arkansas Rules of Criminal Procedure 2.2 and 3.1. Under Rule 2.2, a law enforcement officer may *request* that any person furnish information or otherwise corroborate an investigation or prevention of a crime. However, the rule also states that "no law enforcement officer shall indicate that a person is legally obligated to furnish information or to otherwise cooperate if no such legal obligation exists." Ark. R. Crim. P. 2.2. In a free society, the right to not cooperate with an unreasonable police request is worthless if exercising that right is a crime.

In addition, Rule 3.1 provides that a law enforcement officer present in any place may, in the performance of his duties, stop and detain a person whom he "reasonably suspects" is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. The rule plainly states that "an officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained *shall be released without further restraint, or arrested and charged with an offense." See* Ark. R. Crim. P. 3.1 (emphasis added). For purposes of this rule, "reasonable suspicion" means a suspicion based upon facts or circumstances which give rise to more than bare, imaginary, or purely conjectural suspicion. *See Hammons v. State,* 327 Ark. 520, 940 S.W.2d 424 (1997).

This court has held that the testimony of an arresting officer that he had nothing more than "feelings" that a defendant "might"

be engaged in drug trafficking was not enough to support a reasonable suspicion under the rule. *See Stewart v. State*, 59 Ark. App. 77, 953 S.W.2d 599 (1997). The supreme court affirmed our decision. *See Stewart, supra,* at 332 Ark. 138 (1998). Furthermore, our supreme court held in *Meadows v. State*, 269 Ark. 380, 602 S.W.2d 636 (1980), that the fact that two men looked back at airport police officers and quickened their pace upon being followed did not meet the "reasonable suspicion" standard of Rule 3.1. The record in the case at hand lacks even the proof that we held inadequate in *Stewart* and *Meadows*. Absolutely nothing in the record shows that Officer Swaggerty reasonably suspected that appellant had committed, was committing, or was about to commit the conduct countenanced by Rule 3.1.

Although appellant did not challenge whether Officer Swagerty's conduct was proper under Rules 2.2 or 3.1, the trial court *sua sponte* raised the issue. The court stated:

> The Court finds that it's a real issue with regard to starting with the probable cause to stop and confront. However, even if that's a close issue, I don't believe at that point in time he has the right to cuss the police officer, and it kind of escalated from there.

To its credit, the trial court recognized that the initial stop may have been improper. Yet it failed to apply fundamental Fourth Amendment principles, governing precedent, and relevant rules of criminal procedure to the stop and hold that the police had no legitimate reason to question appellant, let alone detain him, beat him, and arrest him for exercising the right to be left alone. In addition, even if the police had a legitimate reason to question appellant, the trial court failed to recognize that appellant's question, even laced with profanity, did not constitute disorderly conduct.

At the close of the State's case in chief, the following exchange occurred between trial counsel and the trial judge:

> MR. SHAW (*Appellant's counsel*): As to disorderly conduct, Your Honor, we feel the State has not met its burden of proof in this matter. Officer Mayberry testified that when he got to the scene, Mr. Johnson alternatively was getting agitated, and would calm down and apparently cycled back and forth as the course of the conversation took place. . . . Therefore, we would ask the Court to grant motions of directed verdict in all of these matters.
>
> THE COURT: ... Let's go back a little further from there. Let's go back to Swagerty's testimony. What probable cause did Swag-

erty have? As I understand it from Swagerty, he had stated that he was pacing back and forth, looking very nervous, but he was not in the street. He was on a sidewalk at the time ...

MR. ROBERTSON (*counsel for the State*): In addition to that, though, *you do have his belligerent, extremely belligerent attitude that's been consistent throughout the testimony.*

THE COURT: Which occurred afterwards, though. We're talking about probable cause to stop and approach him in the first place. Because he wasn't cussing at the time. He wasn't staggering. He was just standing on the sidewalk pacing back and forth.

MR. ROBERTSON: Under Rule 2.2 a law enforcement officer may request that any person furnish information or otherwise corroborate [*sic*] an investigation or prevention of a crime. The officer testified here that it was late at night, high crime area. He's basically making sure that everything's okay. *He sees an individual out of place*, and he just goes to ask him what's going on. The State submits that under Rule 2.2, approaching him was simply permissible.

THE COURT: Doesn't it also say that he has to tell the person that he has no duty to cooperate with the officer if he doesn't want to?

MR. ROBERTSON: The rule does require that, but under the facts of this case its clear that once Swagerty even stopped and approached him, he didn't have an opportunity to do anything at that point *because of the Defendant's belligerent attitude. He just blew up at that point, so yes, the rule is that he has the obligation to explain that to the Defendant, but he did not have that opportunity in this case . . . With respect to the disorderly conduct, the Defendant cursed from the outset in public, in the street, late at night.*

THE COURT: *I'm going to deny the Motion on Disorderly Conduct. Obviously he's cussing.*

(Emphasis supplied.)

After both sides had rested, the following exchange occurred:

MR. SHAW: Defense rests, Your Honor. I'd like to renew my motion for dismissal on the remainder of the charges before Mr. Johnson ... They've not shown that Mr. Johnson was disorderly at the time that Officer Swagerty came to the scene. The testimony of Officer Swagerty was that apparently Mr. Johnson was immediately abusive in his presence. Mr. Johnson refutes that, and as the Court noted, there was no showing of probable cause for Officer

Swagerty to visit with Mr. Johnson on that evening. If he had a reason, under the Arkansas rules on detainer, that reason would have been dissipated with the arrival of Officer Mayberry who knew this individual, and there was a determination that Mr. Johnson was not a suspect of any illicit activity at that time. There's not testimony as to that ...

THE COURT: That's going to be denied. Basically what you made was your closing argument. I'll give the State a chance to respond to what you made in your close.

MR. ROBERTSON: The only thing I really have in response to what Mr. Shaw just said is ultimately it really is just a matter of credibility. The approach was proper, residential neighborhood, late at night, high crime ... *Once the Defendant started uttering curse words and in the middle of that residential neighborhood, the crime of disorderly conduct was complete.* At that point the officer would have had probable cause to arrest him had been able to do so....

THE COURT: *The Court finds that it's a real issue with regard to starting with the probable cause to stop and confront. However, even if that's a close issue, I don't believe at that point in time he has the right to cuss the police officer, and it kind of escalated from there.* The Court's going to find that there's a conflict in the testimony on the public intoxication and find him not guilty on that. I find him guilty of disorderly conduct.... I find him not guilty of fleeing and find him guilty of the reduced charge of refusal to submit to arrest ... [Emphasis added.]

Appellant plainly contended that his conduct did not constitute disorderly conduct. It is equally clear that appellant was prosecuted on that charge because he cursed the police. The only way that his words could constitute the crime would have been if they were "fighting words" as our supreme court held in *Bailey v. State, supra.* The vast difference between appellant's words and the kind of language found sufficient in *Bailey v. State* is obvious.

A motion for directed verdict at the close of the State's case has as its purpose a procedure for determining, *as a matter of law,* whether the State has met the burden of establishing a *prima facie* case. *Rudd v. State,* 308 Ark. 401, 825 S.W.2d 565 (1992). Appellant argued at trial that the State failed to produce proof sufficient to establish the crime of disorderly conduct. The State's sole basis for that charge was appellant's profanity in asserting his right to be left alone. The trial judge denied appellant's motions for directed verdict knowing these positions. The majority and concurring opinions now affirm that the "trial court was not barred by the arresting

officer's opinion as to what evidence may or may not be sufficient to make an arrest on that charge, much less what evidence is necessary for the court to convict." This observation is irrelevant; neither the prosecution nor the trial judge referred to anything other than appellant's profanity with respect to the disorderly conduct charge. Neither the prosecution nor the trial judge referred to anything else that would support a charge of disorderly conduct under the statute aside from appellant's profanity. The majority is building a case on appeal that the State never alleged below and the trial judge never found.

By employing an extraordinary reasoning process aided, at least in part, by the State's distortion of the record, the majority has engaged in what amounts to a *de novo* conviction while appearing to conduct appellate review. Thus, the majority opinion concludes that Johnson's conduct of removing his shirt and clenching his fist, acts that Mayberry termed "preassaultive cues," can be "fairly characterized as conduct that is prohibited by Ark. Code Ann. section 5-71-207(a)(1)-(3)." The majority cites no case authority for its conclusion or the analytical process used in reaching it. Furthermore, this bizarre conclusion cannot withstand reasoned scrutiny when one examines the record and the statute in question.

Arkansas Code Annotated section 5-71-207 (Repl. 1977) states, in pertinent part:

> (a) A person commits the offense of disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk thereof, he:

> (1) Engages in fighting or in violent, threatening, or tumultuous behavior; or

> (2) Makes unreasonable or excessive noise; or

> (3) In a public place, uses abusive or obscene language, or makes an obscene gesture, in a manner likely to provoke a violent or disorderly response . . .

The prosecution never proved and the trial court never found that appellant did anything "with the purpose of causing public inconvenience, annoyance, or alarm" or that appellant recklessly created a risk of a fight, violence, threat, or tumultuous behavior. No witness testified that appellant threatened anyone. In fact, the record shows that appellant either walked away from Swagerty, Mayberry, and the other officers, or that he turned and remained

stationary when he removed his shirt and clenched his fist. There is no proof that appellant engaged in unreasonable or excessive noise. While Swagerty and Mayberry testified that appellant spewed a stream of profane invectives, the only proof in the record of any profanity that appellant uttered was his initial question to Swagerty, "Why are you f_ _ _ing harassing me?" No one has suggested how this question either purposely or recklessly created a risk of a violent or disorderly response.

Again, the supreme court's decision in *Bailey v. State* shows the kind of behavior deemed sufficient to sustain a disorderly conduct conviction. Not only did the appellant in that case direct various "fighting words" consisting of racial epithets to police officers, the supreme court held that his action in grabbing an officer's arm, in and of itself, supported a conviction under subsection (a)(1) of the statute because this conduct constituted "threatening behavior." The majority can point to no such conduct in this record. Instead, the State conjured a scenario that never happened, which the majority now has embraced as a judicial fig leaf to cover the naked fact that appellant was prosecuted and convicted of disorderly conduct because he used profanity in challenging the police. Despite Mayberry's characterization of appellant's action of removing his shirt and clenching his fists as "preassaultive cues," the record plainly shows that appellant assaulted no one. Appellant threatened no one. None of the police officers claimed that appellant threatened them, assaulted them, reached for them, gestured toward them, swung at them, lunged toward them, or did anything else that threatened them.

Disorderly conduct also can be found where an actor purposely or recklessly engages in "violent" behavior. *See* Ark. Code Ann. § 5-71-207(a)(1). Removing one's shirt may be socially inappropriate or even unsightly; it is not violent. Appellant's action in clenching his fist after he removed his shirt certainly did not constitute "violent behavior" or "threatening behavior," especially given the undisputed testimony from the police officers that appellant had been walking away from them beforehand and the fact that appellant did not advance toward the officers or otherwise threaten them after removing his shirt and clenching his fist.

Making "unreasonable or excessive noise" is also included within the range of behavior covered by the disorderly conduct statute. *See* Ark. Code Ann. § 5-71-207(a)(2). The prosecution witnesses testified that appellant was agitated about what he consid-

ered to be harassment by Swagerty. There is no proof that anyone accused appellant of disturbing the peace by what the prosecution termed his "belligerent" attitude.

The State's brief concludes with the following statement:

> Here, the appellant, upon being confronted by Officer Swagerty, used obscene language and displayed a violent demeanor. Indeed, during the confrontation, the appellant removed his shirt, clinched his fist, *and advanced toward Officer Swagerty in a "preassaultive" manner. Such activity constituted "threatening" behavior which recklessly created a risk of public inconvenience, annoyance or alarm as proscribed by the statute.* Thus, viewing the evidence in the light most favorable to the State, substantial evidence support's the appellant's conviction.

(Emphasis added.) This statement is an flagrant distortion of the record. The only testimony about appellant's conduct in this context came from Mayberry, who testified as follows:

> ... I maintained primary contact with Mr. Johnson. At one point Mr. Johnson turned, took a belated stance towards Officer Swagerty, clenched his fist, and then subsequently pulled his shirt off. All of these based upon my training and my prior experience, I recognized as preassaultive cues on Mr. Johnson's part. It is my understanding that. that is the basis for the terroristic threatening charge. I was in the area with Officer Swagerty. However, it appeared that he was primarily targeting Officer Swagerty. He clenched his fist and pulled his shirt off. He didn't rip his shirt off. He didn't rip and tear the shirt. He just took and pulled his shirt up over his head and threw it to the ground.

Mayberry never testified that appellant "advanced toward Officer Swagerty" or anyone else. Mayberry testified, instead, that appellant "took a belated *stance* towards Officer Swagerty" (emphasis added), and added that such conduct was the basis for the terroristic threatening charge. The trial court found appellant not guilty of terroristic threatening and never suggested that appellant's behavior in removing his shirt and clenching his fist constituted disorderly conduct. Neither the State nor majority cite any authority holding disorderly conduct to constitute a lesser-included offense of terroristic threatening. Swagerty never mentioned that appellant removed his shirt and clenched his fist, let alone alleged that appellant advanced toward him after doing so. Rather than declaring its disapproval of the State's blatant distortion of the record, the majority has strangely embraced the distortion and made it the cornerstone of its rationale for affirming the conviction.

That the majority does so in the name of appellate review despite the fact that the trial court acquitted appellant of the terroristic threatening charge and refused to base the disorderly conduct conviction on the proof that the State now distorts, speaks volumes.

This court does not engage in *de novo* review of the record in criminal cases, be it for disorderly conduct or any other offense. It is not our function to invent possible new grounds for conviction. Our duty to examine the record and analyze the evidence in the light most favorable to the State does not obligate us to condone transparent distortion of the record, no matter who does it. The majority and concurring opinions do not explain why this perverse notion of judicial review is warranted in this case or under what conditions it will be employed in future criminal appeals. Whatever else the majority decision may be, it is plainly an unprecedented and unexplained departure from the standard of appellate review previously announced and followed in Arkansas.

### Racism, Law Enforcement, and Judicial Abdication

This case stands as stark proof about continuing racism and inequality in the American criminal justice system and the failure of police departments, prosecutors, and the courts to address the conclusion of the 1968 Kerner Commission Report on Civil Disorders that "many disturbances studied by the Commission began with a police incident." *See Report of the National Advisory Commission on Civil Disorders* 158. It is unmistakably clear that appellant was approached by Officer Swagerty because he was a black man standing on a public street at night in what the police termed a "high crime area." The "high crime area" where appellant stood happened to be where his relatives lived. He had a right to visit his relatives and stand on the street outside their home while awaiting the arrival of a taxi without being accosted by the police. The police had no basis whatsoever for suspecting that he was engaged in, had committed, or was about to commit a crime. Our supreme court clearly indicated as much when it decided *Stewart v. State*, 332 Ark. 138 (1998), and reversed a conviction for drug possession that was based on a police encounter with a woman who was standing along a street in a "high crime area" at night.

Although I disapprove of appellant's profanity, I denounce Swagerty's initial engagement with appellant, the way that appellant was treated by four police officers after he disapproved of Swagerty's approach, and appellant's prosecution and conviction for disorderly

conduct as racist. Swagerty's testimony proves that appellant's race, presence at night, and desire to be left alone — also known as SWB (standing while black or brown) — caused Swagerty to view him with suspicion. That racist judgment triggered this case. Somehow the police deemed appellant's obvious and understandable irritation about being deemed suspicious due to merely being present and unwilling to interact with them as justification to require him to submit to detention while they attempted to "verify" his account. The fact that the majority avoid even addressing this egregious proof signals police and prosecutors that, in the mind of some judges on this court, the police can act as if black men have no right to be in public unless the police approve of their presence and the way they behave even absent *prima facie* evidence of criminal conduct and not be censured. Some observers would deem that a tacit concession to the idea of a police state.

Courts and judges should forever bear in mind that the history of black people and police conduct has never been good. After the colonists were unable to enslave the indigenous Native Americans, they turned to enslaving and importing Africans. This system was established and maintained through a curious blend of law, religion, and commerce that depended, at bottom, on the enforcement efforts of government agents for its maintenance and growth. Thus, the police became the enforcers of deliberate commercial transactions, religious ideologies, and legal codes aimed at ensuring the subordination of black people in the United States of America.

Eventually the issue of African slavery would propel our nation into the last war fought on our soil, and our bloodiest war ever. Following the defeat of the Confederate States, the Thirteenth Amendment to the federal constitution was ratified in December 1865. In his opinion in the *Slaughterhouse Cases*, 83 U.S. (16 Wall.) 36 (1873), Justice Samuel Miller noted:

> Among the first Acts of legislation adopted by several of the States in the legislative bodies which claimed to be in their normal relations with the Federal Government, were laws which imposed upon the colored race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty and property, to such an extent that their freedom was of little value ... They were in some States forbidden to appear in the towns in any other character than menial servants. They were required to reside on and cultivate the soil without the right to purchase or own it. They were excluded from many occupations of gain, and were not permitted to give testimony in the courts in any case where a

white man was a party. It was said that their lives were at the mercy of bad men, either because the laws for their protection were insufficient or were not enforced.

*Id.* at 70. As had been the case with slavery, post-Civil War race discrimination received governmental mandate as the police remained the chief enforcement agents of a system of peonage aimed at re-enslaving black people as sharecroppers and other menial laborers.

Judge A. Leon Higginbotham, Jr., in his book, *Shades of Freedom: Racial Politics and Presumptions of the American Legal Process,* has recounted "a particularly egregious civil rights violation" in his discussion of *Brown v. Mississippi,* 297 U.S. 278 (1936):

In 1934, three impoverished and "ignorant" African Americans in Kempner County, Mississippi, were suspected of murdering a white man. A deputy sheriff and several of his white cronies brutalized the defendants with some of the most extreme torture ever revealed in a reported American case. One defendant, Yank Ellington, so enraged a mob of twenty white men with his professions of innocence that they whipped him and twice hung him from a tree before finally releasing him to return home in agony. Two days later, the deputy again seized Ellington and took him to jail by a circuitous route that led into the State of Alabama. While in Alabama, the deputy again severely whipped the defendant until he "agreed to confess to such a statement as the deputy would dictate, ... after which he was delivered to jail."

The same deputy then arrested two other African-American men, Ed Brown and Henry Shields. One night, the deputy, the jailer, and several other white men made the defendants strip. The two men were then "laid over on chairs and their backs were cut to pieces with a leather strap with buckles on it." They were repeatedly whipped and told that the whipping would continue until they admitted "in every manner of detail" a confession "in the exact form and contents as desired by the mob." During a two-day trial, the rope burns on Ellington's neck were clearly visible, and the deputy sheriff and others freely admitted to beating all three defendants. The deputy testified that Ellington's whipping by the mob was " [n]ot too much for a negro; not as much as I would have done if it was left to me." Despite the clear evidence that the defendants' pretrial statements were coerced, the trial court denied the defendants' motion to suppress the "confessions." The three men were convicted and sentenced to death. The aggressive young attorney prosecuting the case was John Stennis, and he did not deny the severe police brutality. This case was one of the first steps

in a political career that would later lead Stennis into becoming an "esteemed" member of the United States Senate.

*See* Higginbotham, *supra*, at 162, (notes omitted).

The hard truth from which the State and majority cannot hide is that for racial minorities in this society, the police have often been the foot soldiers in a longstanding effort to deny equal access to life, liberty, and property. Although the Supreme Court declared racial segregation in education unconstitutional in *Brown v. Board of Education*, 347 U.S. 483 (1954), local police and the state militia were used by city officials and Governor Orval Faubus to resist the attempt of black children to attend Little Rock Central High School, thereby leading to the decision in *Cooper v. Aaron*, 358 U.S. 1 (1958). Congress outlawed race discrimination in public accommodations through enactment of the Civil Rights Act of 1964, but the police arrested blacks who attempted to eat at lunch counters in virtually every southern state, including Arkansas. Two of the most searing images of all time will forever be the image of police beating black people as they crossed the Edmund G. Pettus Bridge outside Selma, Alabama, in a march to protest the systematic denial of the voting right guaranteed them by the Fifteenth Amendment, coupled with the image of police dogs and fire hoses turned on peaceful black adults and children under the direction of Eugene "Bull" Connor, chief of the Birmingham, Alabama, police. In these and countless other situations, state courts and judges turned blind and deaf to the injustices aimed at people who, in the words of Justice Black, suffered "because they are helpless, weak, outnumbered, or ... are non-conforming victims of prejudice and public excitement."

Judges should strongly denounce the racist police conduct that this appellant suffered and should not hesitate to do so. In the first place, such conduct violates the very notions of liberty that the United States purports to hold dear. Beyond that, only the most morally and socially unobservant or insensitive among us can deny the tremendous racial disparity in the way the police deal with people of color, and especially black and brown men. The police do not customarily stop white people for walking away from them. The police do not customarily deem white people as criminal suspects when they walk. But the presence of a black person is commonly used by the police as a basis for performing what they deem an "investigatory stop." A black person subjected to that exercise has no recourse when approached. He cannot decline to

talk with the police. If he talks with the police he consents to being investigated as a criminal even absent reasonable suspicion. If he tries to walk away from the police, as appellant did in this instance, he risks being charged with fleeing and other charges. If he protests being approached, the police can charge him with disorderly conduct whether he uses fighting words or not. If he challenges the sufficiency of the evidence to support that charge, this decision shows that judges have neither the sensitivity nor the will to stand, in the words of Justice Black, as "havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or ... are non-conforming victims of prejudice and public excitement."

The concurring opinion wrongly asserts that one must presume that the police were white in order to challenge their conduct as racist. The racist aspect of the initial encounter by Swagerty arose from a presumption about appellant based on *appellant's* race. Any police officer, regardless of his race, who presumes that another person is likely to be engaged in criminal conduct merely because of that other person's race is indulging in a racist stereotype. Regardless of Swagerty's race, he was not entitled to surmise that appellant was a criminal suspect based on appellant's race and mere presence. It is undeniable that the police proceeded from that stereotype, as shown by the prosecutor's statements that Swagerty "sees an individual out of place," in a "residential neighborhood, late at night, high crime [area]...." Moreover, no person should be guilty of disorderly conduct merely because he uses profanity in challenging police conduct, regardless of the officer's race or the race of the person challenging the officer.

The concurring opinion proceeds from yet another flawed premise in asserting that the issue of racism and racially disparate police conduct is not "relevant to the argument advanced by appellant in this case." Justice Cardozo certainly declared in *The Nature of the Judicial Process* that "[t]he judge ... is not a knight-errant roaming at will in pursuit of his own ideal of beauty or of goodness." Yet in the following sentence, Cardozo declared: "He is to draw his inspiration from consecrated principles." *See* BENJAMIN N. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 141 (1921). And before that, the learned Justice wrote:

> The final cause of law is the welfare of society. The rule that misses its aim cannot permanently justify its existence. *Ethical considerations can no more be excluded from the administration of justice ... than one can exclude the vital air from his room and live.*

(Emphasis added.) Another disquieting flaw in the majority and concurring opinions is that ethical considerations surrounding the police behavior in this case somehow can or should be disregarded or excluded from our decision. As Justice Cardozo observed almost a century ago, any legal ruling that fails or refuses to consider its ethical effect on the society in which it operates "cannot permanently justify its existence."

The right to move through society without having to obtain police permission and to challenge unreasonable police conduct is not a private "ideal of beauty or of goodness." It is one of the "consecrated principles" of our republic dating back to the Declaration of Independence and guaranteed by the First and Fourth Amendments. Thus, a judge does not act as "a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness" by denouncing police conduct based on the oppressive notion that freedom to move through society depends on such arbitrary factors as one's race or whether government agents approve of the way one challenges what the agents do. Rather, denouncing such oppressive police conduct affirms a full-bodied and living sense of justice and rejects slavish deference to officious officialdom.

The 1968 *Report of the National Advisory Commission on Civil Disorders* contains this profound statement:

> We have cited deep hostility between police and ghetto communities as a primary cause of the disorders surveyed by the Commission. In Newark, Detroit, Watts, and Harlem — in practically every city that has experienced racial disruption since the summer of 1964, abrasive relationships between police and Negroes and other minority groups have been a major source of grievance, tension, and, ultimately, disorder.
>
> In a fundamental sense, however, it is wrong to define the problem solely as hostility to police. In many ways, the policeman only symbolizes much deeper problems. The policeman in the ghetto is a symbol not only of law, but of the entire system of law enforcement and criminal justice. As such, he becomes the tangible target for grievances against shortcomings throughout that system: against assembly-line justice in teeming lower courts; against wide disparities in sentences; against antiquated correctional facilities; against the basic inequities imposed by the system on the poor ... The policeman in the ghetto is the most visible symbol, finally, of a society from which many ghetto Negroes are increasingly alienated.

. . .

Alone, the policeman in the ghetto cannot solve these problems. His role is already one of the most difficult in our society. He must deal daily with a range of problems and people that test his patience, ingenuity, character, and courage in ways that few of us are ever tested. Without positive leadership, goals, operational guidance, and public support, the individual policeman can only feel victimized. Nor are these problems the responsibility only of police administrators; they are deep enough to tax the courage, intelligence, and leadership of mayors, city officials, and community leaders....

And yet, precisely because the policeman in the ghetto is a symbol — precisely because he symbolizes so much — it is of critical importance that the police and society take every possible step to allay grievances that flow from a sense of injustice and increased tension and turmoil. In this work, the police bear a major responsibility for making needed changes. In the first instance, they have the prime responsibility for safeguarding the minimum goal of any civilized society: security of life and property. To do so, they are given society's maximum power: discretion in the use of force. Second, *it is axiomatic that effective law enforcement requires the support of the community. Such support will not be present when a substantial segment of the community feels threatened by the police and regards the police as an occupying force.*

See REPORT OF THE NATIONAL ADVISORY COMMISSION ON CIVIL DISORDERS 157-58 (emphasis added).

David Cole, a professor at Georgetown University Law Center, more recently addressed this deplorable situation in his 1999 book titled *No Equal Justice: Race and Class in the American Criminal Justice System.* Although Cole's observations about inequality in the criminal justice system focus largely on the threat to Fourth Amendment freedom posed by police conduct and federal court insensitivity, the following passage fits this case and the majority decision.

In effect, then, the [judiciary] has immunized a wide range of law enforcement ... tactics ... disproportionately directed at persons of color. [This] allows the police to rely on unparticularized discretion, unsubstantiated hunches, and nonindividualized suspicision. Racial prejudice and stereotypes linking racial minorities to crime rush to fill the void. As a result, many innocent minorities are stopped, questioned, and searched on a routine basis, reinforcing a sense among members of minority communities that the police are

their enemy, and that they have been singled out for suspicion because of the color of their skin.

None of this is necessary. Were [judges] so inclined, [they] could adopt rules that would demand equal protection rather than rules that invite racial targeting and discrimination. ... [Judges] should be particularly skeptical of bases for suspicion that seem to be manufactured by police conduct — such as "location plus evasion" ... which often do little more than legitimate generalized prejudices.

. . .

If we restored equality to the policing process, it would become more "self-policing." If well-to-do white people were routinely stopped, questioned, and searched, there would likely be more community pressure on the police to regulate themselves. We would likely find more sympathy within the legislative, executive, and judicial branches for protecting those subjected to such tactics. Restrictions on police behavior would soon develop. If those restrictions turned out to impede law enforcement too greatly, we would be forced as a community to reach a consensus on where the appropriate line should be drawn — *for everyone* — between crime control and privacy interests.

But under the law as it stands, wealthy white people are not subject to such treatment; black and Hispanic people are, and especially poor black and Hispanic people living in the inner city. These groups are underrepresented in all branches of government. The fact that these tactics are for the most part targeted along race and class lines means that coalitions between the powerful and powerless are unlikely. The association of blacks and Hispanics with crime that appears to pervade much of the white community makes it likely that whites will perceive their interests to be at odds with those of minority groups on these issues. Because they do not [equally] bear the costs of law enforcement, white people have less reason to be concerned about discretionary law enforcement.

*See* David Cole, *No Equal Justice: Race and Class in the American Criminal Justice System*, 53-55 (1999) (emphasis in original).

Cole also documented reasons that black and brown people are uncomfortable during encounters with the police:

Stories of black men being stopped by the police for no apparent reason other than the color of their skin are so common that they are not even considered news, and often get reported only when the victims happen to be celebrities or the confrontation is captured on film. In 1988, Joe Morgan, former All-Star second base-

man of the Cincinnati Reds, was at Los Angeles International Airport waiting for a flight to Tucson. According to Morgan and an eye witness, a police officer approached Morgan while he was making a phone call, said he was conducting a drug investigation, asked for his identification, and accused him of traveling with another person suspected of dealing drugs. Morgan objected, and turned to get his identification from his luggage, forty feet away. The officer grabbed him from behind, forced him to the floor, handcuffed him, put his hand over Morgan's mouth and nose, and led him off to a small room, where the police ascertained that Morgan was not traveling with the suspected drug dealer after all. The police maintained that Morgan had been hostile throughout the encounter, and that he had been forced to the floor only after he started swinging his arms. Even by the police officer's own account, however, the only basis for approaching Morgan in the first place was that another black man, stopped as a suspected drug dealer, had told the officers that he was traveling with a man that "looked like himself." As a result, the officers were on the lookout for a black man, and Joe Morgan fit that description.

In 1989, former police officer Don Jackson was doing a news story about police abuse against black men in Long Beach, California, when he was pulled over by the police on Martin Luther King, Jr., Boulevard, allegedly for straddling lanes. When he asked why he was being stopped, an officer pushed him through a plate glass store window. NBC captured the incident on film. In 1992, the ABC news magazine "20/20" conducted an experiment, sending out two groups of young men — one white, the other black — on successive evenings in Los Angeles. They drove in identical cars and took identical routes at identical times. The black group was stopped and questioned by police on several occasions in one evening, while the white group saw police cars pass them by sixteen times without showing any interest.

In 1990, the Massachusetts Attorney General's Civil Rights Division issued a report condemning the Boston Police Department for a practice of subjecting black citizens to unconstitutional stops and searches. The report recounted more than fifty such incidents in 1989 and 1990. ... The report also discussed widespread complaints that the Boston Police Department had responded to the killing of a white woman, Carol Stuart, by engaging in unconstitutional stops, searches, and interrogations of young black men. Carol Stuart was in fact killed by her husband, Charles Stuart, a white man, who then falsely claimed that a black man had killed his wife.

As a result of such experiences, and the recounting of these and countless similar tales within the black community, black citizens, and particularly young black men, are likely to feel considerably

less comfortable than members of other demographic groups in their encounters with police officers ... As Judge Julia Cooper Mack of the District of Columbia Court of Appeals put it in another case, "no reasonable innocent black male (with any knowledge of American history) would feel free to ignore or walk away from a drug interdiction team...."

*Id., supra,* at 25-26 (citations omitted).

## Conclusion

Years ago, Justice Felix Frankfurter declared that "there comes a point where this Court should not be ignorant as judges of what we know as men." *See Watts v. Indiana,* 338 U.S. 49, 52 (1952) (citing Taft, C.J., *Bailey v. Drexel Furniture Co.,* 259 U.S. 20, 37 (1922) (Child Labor Tax case)). Were we to reverse appellant's conviction and denounce the way he was treated, Swagerty, Mayberry, the Jacksonville Police Department, other law enforcement agencies, prosecutors, racial minority group members, and the rest of society, would receive a powerful and long overdue message that occupation-force tactics such as those manifested in this record will not be tolerated. Affirming the conviction, on the other hand, simply adds more fuel to the ever-present hostility and simmering rage of many persons from poor and minority communities about unjust police conduct.

Eventually people subjected to such police misconduct, and the failure of judges to denounce it, lose faith in the notion of equal treatment and with it, lose faith in the notion of being part of the "community." That alienation largely accounts for the difficulty police have in getting cooperation as they investigate reports of crime and locating witnesses. It contributes to why persons in poor and minority neighborhoods often are unwilling to respond when summoned for jury service. People victimized by a criminal justice system that purports to stand for equal justice under law while relegating them to second-class treatment by agents of government holding ultimate discretion in the use of force eventually become alienated from that system and the society that sponsors it. As their alienation increases, support for law enforcement will decrease. At worst, more people will become outlaws, as David Cole has observed.

When significant sectors of a community view the system as unjust, law enforcement is compromised in at least two ways. First,

people feel less willing to cooperate with the system, whether by offering leads to police officers, testifying as witnesses for the prosecution, or entering guilty verdicts as jurors. Second, and more importantly, people are more likely to commit crimes, precisely because the laws forbidding such behavior have lost much of their moral force. When the law loses its moral force, the only deterrents that remain are the strong-arm methods of conviction and imprisonment. We should not be surprised, then, that the United States has the second highest incarceration rate of all developed nations. And it should be no wonder that black America, which has been most victimized by the inequalities built into the criminal justice system, is simultaneously most plagued by crime and most distrustful of criminal law enforcement.

See *Cole, supra* at 11-12.

Affirming the result of abusive, racist, and disparate police conduct sends the wrong message: that the courts will not protect the rights of poor, disfavored, and helpless people. No one should be surprised, then, when members of that group express outrage against police misconduct even if one disagrees with the way that rage is vented. The greater surprise and disappointment is that judges and other officials responsible for administering criminal justice refuse to acknowledge obvious inequities and do anything about them.

I dissent from today's decision. Judge NEAL has authorized me to state that he joins this opinion.