Affirmed by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge FLOYD joined. Judge GREGORY wrote a dissenting opinion.
*361 OPINION
NIEMEYER, Circuit Judge:
During the course of a voluntary citizen-police encounter, City of Richmond (Virginia) police seized Sean Black, in a constitutional sense, patted him down, and, after discovering an illegal firearm, arrested him. Along with the firearm, heroin was then recovered from Black’s person. Black was ultimately convicted of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession of heroin, in violation of 21 U.S.C. §§ 841 and 844. The district court sentenced Black to 360 months’ imprisonment, which was based on a one-level upward departure under the district court’s Sentencing Guidelines calculation.
On appeal, Black challenges the district court’s denial of his motion to suppress, contending that the Richmond police did not have the reasonable suspicion necessary to seize him and thus violated his Fourth Amendment rights. He also challenges the reasonableness of the district court’s sentence. For the reasons that follow, we affirm.
I
On the evening of December 17, 2005, City of Richmond Police Detective Sean Adams, Detective Daniel Minton, and Officer Perry Barber were driving in a marked patrol car through the Mosby Court area of Richmond, a “high-crime” neighborhood that had been designated as a target of the police department’s violent crime reduction initiative, to increase police visibility in that area. Detective Adams knew the neighborhood to be a high-crime area, and he had made numerous arrests for drugs and trespassing in Mosby Court in his 12 years as a police officer.
Around 9:00 p.m., the officers pulled into a parking spot near 1336 Coalter Street, a building posted with “No Trespassing” signs, which the police department was authorized to enforce. A group of four or five people were gathered near a breezeway in front of the building, but when the officers arrived, they immediately dispersed in different directions. As the officers exited the vehicle, Sean Black, who was standing about thirty feet from the breezeway, started walking across the street past the passenger side of the police car. When Detective Adams asked Black, “Hey man, do you live out here?” Black stopped, turned to Adams, and said that he lived across the street at 1312 Coalter, which was the direction toward which he had been walking. After turning his flashlight on Black’s midsection, Detective Adams noticed that Black’s left hand was outside of his coat pocket, but his right hand was awkwardly inserted halfway in his right coat pocket and was “cupped,” as if grasping an object. Adams, concerned about the possibility of a weapon in Black’s pocket, asked Black, “Can you take your hand out of your pocket?” Black did not respond either verbally or by removing his hand from his pocket. When Adams repeated the request, Black took his hand out of his pocket. Adams then saw a bulge “6 to 8 inches long along the bottom of the pocket” and “1 to 1 lh inches high” that “appeared to have a flat side.” Adams suspected that the object was a firearm. Detective Minton, who was standing behind Black, also discerned a bulge in the pocket but did not see its shape as clearly.
The following exchange then occurred between Detective Adams and Black:
ADAMS: What’s in your pocket?
BLACK: Huh?
ADAMS: What’s in your pocket?
BLACK: Nothing.
*362 ADAMS: What?
BLACK: My money and my ID.
Adams believed Black’s answer to be flatly inconsistent with the shape of the object in Black’s pocket, which appeared to be the slide of a semi-automatic handgun.
Black then put his hand back into his right coat pocket, and Detective Adams “became nervous.” Adams placed his hand on his gun and said, “[T]ake your hand out of your pocket. I don’t want to have to shoot you.” Black removed his hand from his pocket, and Adams ordered Black to move to the police car where Adams patted him down. Adams immediately confirmed that the bulge in Black’s right coat pocket was a firearm. Adams then handcuffed Black and removed a Ruger semi-automatic handgun from Black’s pocket, which was loaded and had a round in its chamber. When Black acknowledged that he did not have a concealed-carry permit for a weapon and that he was a convicted felon, the officers placed Black under arrest. From the search that followed, the officers recovered from Black’s person a razor blade and individually wrapped baggies of an off-white rock-like substance that was later determined to be heroin.
Before trial, Black filed a motion to suppress the evidence seized from him, contending that the seizure by the officers violated his Fourth Amendment rights and was not justified by a reasonable suspicion of criminal wrongdoing, as required by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Following a hearing on the motion, the district court found the facts stated above. It then concluded that the encounter between Detective Adams and Black was initially a voluntary citizen-police encounter, as described in Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), but that during the encounter Black was “seized” in a constitutional sense “when Officer Adams told Black to take his hand out of his pocket because he didn’t want to have to shoot him.” The court held, however, that the seizure was justified because at that point in time the officers had a reasonable, artic-ulable suspicion that Black was illegally carrying a firearm. Accordingly, the court denied Black’s motion to suppress.
After the jury convicted Black, the district court sentenced him to 360 months’ imprisonment, which was based on a one-level upward departure under the Sentencing Guidelines. The government moved for an upward departure based on Black’s criminal history. Because Black’s criminal history was already at the maximum Category VI, the way to reflect an underrepre-sentation of this history was to increase the offense level. See U.S.S.G. § 4A1.3(a)(4)(B). The government observed:
The nature and sequence of the defendant’s prior criminal record are significant here. In 1989, Sean Black, who was fifteen at the time, killed Everett Hubbard in Richmond, Virginia after Hubbard had taken a bag of narcotics from him. Black shot Hubbard twice in the back and once in the head. Black was convicted of voluntary manslaughter and served approximately two years in prison. Less than a year after his release, he committed new crimes, including receiving stolen property. Black was arrested for possession of cocaine on July 14, 1994, and gave a false name during the booking process. He also severely beat a man and was later convicted of malicious wounding. Black served approximately 10 years in prison, and was paroled on May 24, 2005. Within two weeks, he violated his parole by violently acting out at his treatment program. He was referred to an inpatient treatment program, and was re *363 leased from that on August 17, 2005. He committed the instant offenses on December 17, 2005. Over the course of his years of incarceration, Black incurred 61 institutional infractions, including violent offenses.
The district court granted the government’s motion to increase the Guidelines recommendation, explaining:
In my judgment the criminal history category ... significantly underrepre-sents the serious[ness] of the defendant’s criminal history, even though it’s the most serious of criminal histories, and it certainly underrepresents the likelihood that the defendant will commit further crimes.
He, in fact, has proved the likelihood of committing further crimes after the offense of conviction [in this case] by committing further crimes, two further crimes. One is to threaten someone with bodily harm. The other is to effectuate it with aggravated assault.
The court concluded under 18 U.S.C. § 3553(a) that the enhanced sentence best served the goals of federal sentencing and imposed a 360-month sentence.
From the district court’s judgment, Black appeals, challenging the district court’s denial of his motion to suppress and the reasonableness of his sentence.
II
The parties agree that the encounter between Black and Detective Adams on December 17, 2005, began as a consensual encounter. Black argues, however, that when he was seized during that encounter — when Adams ordered Black to take his hand out of his pocket because he did not want to have to shoot him — his Fourth Amendment rights were violated because the officers did not have a reasonable suspicion at that time that he had committed or was committing a crime. Black does not contend that the district court’s factual findings were clearly erroneous. Rather, he argues that the facts leading up to his seizure were insufficient as a matter of law to support a Terry seizure.[1] Relying on United States v. Burton, 228 F.3d 524 (4th Cir.2000), Black asserts that the police had no right to pat him down merely because he exercised his clearly established “legal right to choose not to respond to the directive to remove his hand from his pocket” during a consensual encounter. As he summarizes the facts:
Black was simply walking home on a cold night with his hand partially closed inside of his coat pocket. Officer Adams was looking for a “legal” reason to pat down an individual in the area. As the officers approached Black, all he did was continue [to] walk in the same non-evasive manner and exercise his legal right to choose not to respond to the directive to remove his hand from his pocket.
He argues that the officer’s “nervousness” was at most a “subjective belief’ or a “hunch,” not evidence that criminal activity was afoot.
*364 The government contends that when Detective Adams seized Black, he had a reasonable suspicion that Black had an illegal concealed weapon in his pocket, in violation of Virginia Code § 18.2-308 (making concealed carry of a weapon without a permit unlawful), much in the manner that justified a Terry stop in United States v. Mayo, 361 F.3d 802, 807-08 (4th Cir.2004). Accordingly, the government maintains that Detective Adams was entitled to conduct a brief investigatory stop under Terry v. Ohio and then to frisk Black out of legitimate safety concerns.
To the extent that we are reviewing the district court’s factual findings, we do so for clear error, and to the extent we are reviewing its legal determinations on the basis of those facts, we review de novo. See United States v. Perkins, 363 F.3d 317, 320 (4th Cir.2004). And “[bjecause the district court denied the motion to suppress, we construe the evidence in the light most favorable to the government.” Id.
We begin by noting that voluntary citizen-police encounters do not implicate the Fourth Amendment. Although the Fourth Amendment prohibits unreasonable seizures of persons, “law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place.” Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). “Police may question citizens without implicating Fourth Amendment protections .... Indeed, officers remain free to seek cooperation from citizens on the street without being called upon to articulate any level of suspicion or justification for their encounters.” Burton, 228 F.3d at 527 (citing INS v. Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). Because such encounters are voluntary, a citizen approached by a police officer in this way has the “right to ignore his interrogator and walk away.” Terry, 392 U.S. at 33, 88 S.Ct. 1868 (Harlan, J., concurring). Indeed, a citizen need not even leave the area to avoid speaking with the police; he has a “right to go about his business or to stay put and remain silent in the face of police questioning.” Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); Burton, 228 F.3d at 528. The fact that a police officer seeks cooperation or information by itself, however, does not establish a seizure. See Schultz v. Braga, 455 F.3d 470, 480 (4th Cir.2006).
But when a police officer, during a voluntary encounter or otherwise, “observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot,” the officer may temporarily seize and detain a citizen. Terry, 392 U.S. at 30, 88 S.Ct. 1868. Moreover, in connection with such a seizure or stop, if presented with a reasonable belief that the person may be armed and presently dangerous, an officer may conduct a protective frisk. Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); see also Mayo, 361 F.3d at 806-07. In determining whether a Terry stop is supported by reasonable suspicion, we determine whether the “totality of the circumstances” presented the detaining officer with a “particularized and objective basis” to conclude that a crime may have been committed or was being committed. Mayo, 361 F.3d at 805 (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)) (internal quotation marks omitted).
In this case, during the encounter with Black, which was initially voluntary, Detective Adams was presented with the following circumstances, all of which were known *365 or experienced before Adams effected a Terry seizure of Black:
First, the encounter occurred in a high-crime area that Detective Adams knew to be a locus of drug — and firearm — related criminal activity. His patrol arrived in the area as part of a Richmond initiative to reduce violent crimes, and he personally had made numerous arrests in Mosby Court.
Second, when police initially spoke with Black, he had his left hand out of his pocket and his right hand awkwardly inserted halfway in his right-hand pocket, “cupped” as if “grasping an object.”[2]
Third, Black hesitated to remove his hand from his pocket, without saying either yes or no, in response to Detective Adams’ request.
Fourth, after Black did remove his hand, Detective Adams saw a bulge which was “6 to 8 inches long along the bottom of the pocket,” “1 to Vk inches high,” and “appeared to have a flat side.” Detective Adams stated that he suspected the object was a firearm.
Fifth, Black apparently lied about what the object in his pocket was, stating first that he had “nothing” in his pocket and then stating that it was “money and my ID.” Neither answer explained the large bulge.
Sixth, after Detective Adams engaged Black in the conversation and Black surely recognized that Detective Adams did not believe his statements about what was in his pocket, Black put his hand back in the pocket where the suspected gun was.
Only at this point in the encounter did Detective Adams put his hand on his own gun and tell Black, “[Tjake your hand out of your pocket. I don’t want to have to shoot you.” Adams then ordered Black to move to the police car and thus had effectively seized him for Fourth Amendment purposes.
In the totality of these circumstances, we conclude that Detective Adams had a reasonable suspicion that Black had a firearm concealed in his pocket, in violation of Virginia law, and therefore was justified in conducting a Terry stop and patting Black down. See Mayo, 361 F.3d at 807 (“But the fact that Mayo removed his hand from his pocket did not reduce the level of suspicion that the officers had that Mayo was violating the law by carrying a concealed weapon without a permit.”) (emphasis omitted). Surely, there could be other explanations for Black’s actions and what the officers observed, but a reasonable suspicion need not rule out all innocent explanations; it need only be a suspicion, albeit a reasonable one. As the Supreme Court has stated, “A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct.” Arvizu, 534 U.S. at 277, 122 S.Ct. 744. Even where each individual factor “alone is susceptible of innocent explanation,” the question is whether, “[t]ak *366 en together,” they are sufficient to “form a particularized and objective basis” for an officer’s suspicions. Id. In the totality of the circumstances noted, we conclude that Detective Adams had a reasonable articu-lable suspicion that Black was concealing a firearm, and with that suspicion, he was then entitled, in the circumstances of this case, to pat Black down for the officers’ safety. See Adams, 407 U.S. at 146, 92 S.Ct. 1921; Mayo, 361 F.3d at 806-07.
Accordingly, we affirm the district court’s order refusing to grant Black’s motion to suppress.
Ill
Black also contends that the district court erred in departing upward by one level in calculating the recommended Guidelines sentence. Our careful review of the record, however, reveals that the district court amply articulated its reasons for granting the government’s motion to depart upward based on the substantial underrepresentation of the seriousness of Black’s criminal history. The court also considered the increased sentence in light of the factors in 18 U.S.C. § 3553(a), determining that the enhanced sentence would serve the goals of federal sentencing. Finding no procedural or substantive error in sentencing, we are unable to conclude that it was unreasonable and therefore affirm. See Gall v. United States, 552 U.S.-, 128 S.Ct. 586, 597-98, 169 L.Ed.2d 445 (2007).
For the foregoing reasons, the judgment of the district court is

AFFIRMED.

. Our dissenting colleague argues for a different point, earlier in time, during the citizen-police encounter at which Black was seized so as to be able to argue that at that point the officer did not have a reasonable suspicion to conduct a Terry stop. In doing so, however, the dissent ignores the conclusion reached by the district court that Black was seized "when Officer Adams told Black to take his hand out of his pocket because he didn’t want to have to shoot him.” J.A. 148. Black did not challenge that ruling in his brief, nor has he challenged any factual finding by the district court upon which that ruling was based. Instead, Black focused his sole argument on whether, at the time of the seizure found by the district court, the officers had a reasonable suspicion to make a Teiry stop. See Brief of Appellant at 12.

. The dissent makes much of the point that Black cupped his hand in his pocket simply in response to the temperature of a winter evening. Indeed, the opinion goes to some lengths to suggest that a cupped hand was the natural posture for a cold hand in the pocket. This argument, however, ignores the facts that Black’s hand was not fully in the pocket but was half in the pocket, cupped over something that was there, and that the other hand was not in a pocket at all. As the officer testified, "I could see that his left hand was empty and at his side, but his right hand was in his lower coat pocket ... partially into his pocket.” J.A. 62. Moreover, it disregards the district court's factual findings that "Mr. Black did appear to be cupping his hand around something in his pocket,” J.A. 150, and the "officer thought that the hand was grasping an object. It was into the pocket above the knuckles,” J.A. 143.