******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., with whom ZARELLA, J., joins, dissenting. In today's decision, the majority concludes that the defendant, Michael Edmonds, was seized within the meaning of the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the constitution of Connecticut, by the mere act of a police officer speaking to him. The most troubling aspect of the majority's determination is that it rests not on the record and findings of the trial court, but on the majority's own inferences and assumptions about the record and a misreading of the relevant case law. The majority's decision disregards the appropriate standard of review, muddles our search and seizure jurisprudence, and will ultimately have the practical effects of hindering law enforcement at the most fundamental level and further endangering citizens living in crime-ridden neighborhoods. Accordingly, I am compelled to dissent. In my view, the Appellate Court properly concluded that the record was inadequate to permit appellate review of the defendant's previously unraised claim that he was seized upon a police officer's verbal order to stop. *State* v. *Edmonds*, 151 Conn. App. 763, 770, 96 A.3d 607 (2014). I would also conclude that the Appellate Court correctly determined that the defendant was not seized until the police performed a patdown search of his person, at which point the police possessed a reasonable and articulable suspicion that the defendant was engaged in criminal activity. Id., 766. I would therefore affirm the judgment of the Appellate Court.

Prior to charting the factual landscape of the present case, I set forth the proper standard of review rather than the incorrect reading of the standard that the majority applies for the purposes of this case. In reviewing a motion to suppress, this court accords great deference to the findings of the trial court. "[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). In the present case, the testimony of the arresting officers was central to the trial court's factual findings and legal conclusions. "[W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct

and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) Id.

Conversely, the majority opinion states that "the standard of appellate review governing allegedly unconstitutional police searches and seizures differs from the standard that governs appellate review of other types of similarly fact intensive questions." While correctly recognizing that when presented with a claim of constitutional magnitude we must "[conduct] a scrupulous examination of the record" to ascertain whether each finding is supported by substantial evidence; *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008); the majority takes this to mean that this court need not defer to the trial court's factual findings, but rather may examine the record in order to make its own findings in opposition to those found by the trial court. Although *Burroughs* correctly states the standard of review in the context of the present case, the majority broadly applies *Burroughs* and does so in a manner inconsistent with the mandate that we are to leave undisturbed the factual findings of the trial court unless the findings are clearly erroneous in light of the record as a whole. Id. The majority does not suggest that the trial court's findings are in error and although the majority purports to defer to the trial court, a comparison of the facts as found by the trial court and the majority's facts demonstrate otherwise.

The majority also seeks to broaden the standard of review by purporting that "we must take account of any undisputed evidence that does not support the trial court's ruling in favor of the state but that the trial court did not expressly discredit." In support of this position, the majority relies on our decision in *State* v. *DeMarco*, 311 Conn. 510, 88 A.3d 491 (2014). The majority's reliance, however, is misplaced. In *DeMarco*, this court recognized that in reviewing a motion to suppress, "[i]f the [police] officers' own testimony as to what occurred is internally consistent and uncontested by the defendant but, in fact, undercuts the trial court's ruling in favor of the state, a reviewing court would be remiss in failing to consider it." Id., 520. Of course, the majority is correct in taking note of undisputed evidence in the record that the trial court did not discredit. But where the majority errs is in taking this a step too far and using the evidence in the record to make its own findings and even resolve inconsistencies in the officers' testimony, which *DeMarco* expressly forbids. Id., 519–20 ("It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or disbelieve a competent witness are beyond our review." [Internal quotation marks omitted.]).

Instead, the majority quibbles with and repeatedly

questions the trial court's factual findings and introduces its own assumptions and inferences into the factual matrix of the present case, all while continually professing to do so under the auspices of the standard of review. Scrupulous review of the record requires us to examine whether the trial court's findings are supported by substantial evidence, not to decide what factual conclusions we ourselves would draw from that same evidence. See *State* v. *Burroughs*, supra, 288 Conn. 843. To conclude otherwise is to forsake our role as an appellate tribunal.

Because we are an appellate court, the raison d'être of this institution is to review the judgment of the trial court without substituting our own preferred determinations in place of those of the trial court. In broadening the appropriate standard of review, the majority ignores "the fundamental distinction between the function of the fact finder, which is to make credibility determinations and to find facts, and the function of the appellate tribunal, which is to review, and not to retry, the proceedings of the trial court." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007). Although the trial court is obviously not infallible, this court has historically recognized the trial court's advantage in seeing witnesses and evidence firsthand, which warrants great deference to its determinations. *State* v. *Brown*, 279 Conn. 493, 514, 903 A.2d 169 (2006). The review undertaken by this court, however, is confined to a cold, printed, and impersonal record. As such, we are not equipped to make factual findings. *State* v. *Lipscomb*, 258 Conn. 68, 74, 779 A.2d 88 (2001) (trial court is in "unique [position] to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us" [internal quotation marks omitted]).

In order to present a version of the facts that is faithful to the record and the factual findings of the trial court, I take the time here to restate the relevant facts in a manner that ensures their accuracy and reflects this court's proper role in relation to that of the trial court. At approximately 7 p.m. on January 28, 2011, Officers Elson Morales and Joseph Lawlor of the Bridgeport Police Department were on patrol in their cruiser in the vicinity of Madison Avenue and Capitol Avenue in Bridgeport. The officers were on alert that evening as the police anticipated a large influx of youth into the neighborhood due to a nearby high school basketball game and this area of Bridgeport was well-known among local police for robberies and other violent crimes. As Morales and Lawlor proceeded down Madison Avenue, they observed the defendant standing alone in the poorly lit parking lot of a Subway sandwich shop. Because Morales was aware that the Subway shop had been the target of previous robberies, he radioed

his supervisor, Sergeant Ronald Mercado, who was on patrol nearby, and informed him of the defendant's presence.

A brief description of the Subway parking lot in which the defendant was standing is helpful in understanding the facts in the present case. The Subway shop and its parking lot are located on a corner lot at the intersection of Madison Avenue and Capitol Avenue. The parking lot wraps around the building containing the Subway in an L-shape and has vehicle entrances from both Madison Avenue and Capitol Avenue. At the time of the defendant's arrest, the parking lot was open and was not enclosed by a fence, gate, or wall. Although the parking spaces in the lot are for the customers of Subway and a nearby bakery, the back side of the Subway building contains a flight of stairs that begins in the parking lot at the corner of the "L" and ascends to upper floor apartment units. To reach the stairs, residents of the apartments would have to walk through the parking lot. Several parking spaces are painted onto the asphalt along the long side of the Subway building.

Morales and Lawlor drove into the parking lot from the Madison Avenue entrance at the same time that Mercado pulled in from the Capitol Avenue entrance. The defendant was standing near one of the parking spaces along the side of the Subway building. Although both police vehicles were marked, there was no testimony that the officers had activated the lights or sirens in either vehicle. As soon as the police arrived, the defendant began to walk away while making a number of movements around his waist. When the officers exited their vehicles and approached the defendant, he blurted out, " 'I didn't rob anyone,' " and repeatedly told the officers that he was embarrassed. Morales then performed a patdown search of the defendant, during which a plastic packet fell from the defendant's waistband. Its contents were later found to contain narcotics.

The majority's failure to apply the proper standard of review results in an array of "facts" and groundless inferences that support the majority's own outcome, but that often run counter to the trial court's findings of fact or address details that the trial court never considered. As an addendum to my presentation of the facts as they were actually found by the trial court, I am obligated to point out each instance in which the majority draws a conclusion that has dubious or nonexistent support in the record in order to fully demonstrate both the majority's alteration of the standard of review and the threats that the improper standard poses to this court's fundamental role as an appellate tribunal. Upon my own review of the record, I have identified the following fifteen instances in which the majority finds facts that have insufficient or no support in the record:

First, the majority "assume[s]" that the Subway out-

side of which the defendant was standing was open for business. The majority takes this for inviolable fact merely because at oral argument before this court the state acknowledged that the Subway *may* have been open. But merely because an attorney says something does not make it an indisputable fact, particularly so here, where the record is utterly devoid of any information about the Subway shop's business hours or whether it was open on the day and time of the defendant's arrest. Furthermore, it is an elemental principle that arguments of counsel are *not* evidence. See *Bartholomew* v. *Schweizer*, 217 Conn. 671, 684–85, 587 A.2d 1014 (1991). If that principle is true in the trial court, it surely holds equal force in this court.

Second, the majority decides that the "only reasonable inference" is that "*anyone* standing outside of the Subway" would "necessarily" have been standing in the shadows. (Emphasis in original.) The record does not support the majority's absolute conclusion that *anyone* in the parking lot would *necessarily* have been obscured in darkness. Although the record does reflect that there were not any lights on in the parking lot at the time of the defendant's arrest, Lawlor's testimony also clearly indicates that he nonetheless was able to see the defendant's silhouette and the color of his jacket despite the impenetrable darkness in which the majority concludes he "necessarily" would have been cloaked.

Third, the majority opinion concludes that the police cruisers "simultaneously" converged on the defendant, and then immediately contradicts itself by citing a statement to the contrary in the police report, namely that Morales and Lawlor entered the parking lot *prior* to Mercado's entrance. The trial court itself found only that the two cruisers entered the parking lot's two entrances at the same time, which is very different than the majority's would-be finding that the cruisers "simultaneously" converged on the defendant and blockaded him where he stood.

Fourth, the majority "must understand" the trial court's finding to "mean that the two cruisers arrived at the lot at *approximately* the same time" in order to support its preferred sequence of events, in which the cruisers "simultaneously converged on [the defendant's] position in the middle of the lot." (Emphasis in original.) But why must we understand the trial court's memorandum of decision to mean anything other than exactly what it states: "The two officers and Sergeant Mercado entered the parking lot at the same time and through the only two entrances into the [Subway] parking lot." The trial court's finding is supported by the officers' testimony, so why attempt to qualify or embellish it at all?

Fifth, the majority decides that the defendant could "presumably" have walked around the parked police cruisers onto either Capitol or Madison Avenues. The

majority points to nothing in the record that supports this other than its own presumption.

Sixth, the majority assumes that "it would have been apparent" to the defendant that the police had entered the lot for the sole purpose of apprehending him. This is pure speculation. The defendant never testified and we have no way whatsoever of knowing what the defendant would have been thinking when the officers arrived in the parking lot.

Seventh, the majority concludes, with absolutely no basis, that the police would "not be expected to routinely patrol" in the area where the defendant was arrested. There is no support in the record for this proposition. Indeed, there is support to the contrary, namely Morales' testimony that he had previously conducted police work in that area of Bridgeport and was currently assigned to a special detail patrol of that area, and the trial court's finding that the officers' conduct was "normal" and "routine."

Eighth, the majority describes, with much hyperbole, the defendant as being cut off in all directions by the police like the "protagonist" in "espionage and other action genre films." This is an inaccurate reflection of the facts in the record as there is no indication that the officers blockaded the defendant with their cruisers all at once as the majority suggests.

Ninth, the majority "must at least assume" that the police illuminated the defendant in the headlights of their cruisers despite the lack of any testimony or evidence whatsoever indicating that the officers focused their headlights on the defendant. Why "must" we "assume" this? We should not be assuming *anything*, let alone drawing legal conclusions based on those assumptions.

Tenth, the majority, despite never having witnessed the police officers testify, takes it upon itself to correct an inconsistency in the testimony of the officers that the trial court itself never deemed necessary to address. No matter how "reasonable" the majority considers its own conclusion that Mercado spoke to the defendant first and Morales merely "interacted" with him, making such a resolution is fundamentally and solely the role of the trial court. At the suppression hearing, Morales testified that Mercado first spoke to the defendant, whereas Lawlor testified that Morales was the first to initiate contact with the defendant. But rather than just acknowledging the contradiction or requesting an articulation from the trial court, the majority simply resolves the factual inconsistency itself and in doing so may quite possibly have injected a factual error into its decision.

Eleventh, the majority determines exactly what the officers would have seen from their cruiser on Madison Avenue, namely an "otherwise nondescript man . . . if they could even discern that" the individual was actu-

ally a male or not. Lawlor testified that he saw the defendant's silhouette and the color of his jacket. The trial court found that Morales and Lawlor "observed [the defendant] standing alone" in the parking lot. There is no need to speculate beyond the trial court's finding and the officers' given testimony as to what they did or did not see.

Twelfth, the majority speculates as to *why* the defendant would have been standing in the Subway parking lot. Perhaps, the majority postulates, the defendant was "waiting for his children to come out of the restroom" or "reviewing the menu" or "pondering whether he was in the mood for sandwiches or fish" or "taking a smoke break" or "just getting a breath of fresh air." Again, this is sheer speculation. The defendant never testified and we have no way of knowing what thoughts were in his mind prior to his arrest. And regardless, this is irrelevant to the issue before the court.

Thirteenth, the majority assumes that "police-citizen relations" were estranged in the neighborhood of the defendant's arrest. There was no testimony to this effect and the trial court made no findings that the relationship between citizens and the police had broken down in the neighborhood where the defendant was arrested.

Fourteenth, the majority states that "[the police] never even testified that they actually believed the defendant was carrying a weapon." Lawlor, however, clearly testified that the defendant was initially patted down for officer safety because the officers found the defendant's furtive movements around his waist "concerning . . . [b]ecause typically weapons are hidden such as guns in the waistband, knives." Despite the majority's insistence otherwise, the testimony demonstrates that, under the circumstances, the officers believed that the defendant may have been armed.

Fifteenth, the majority offers generic and unsupported approximations of the exact length of a typical human arm and the exact manner in which a typical human moves while walking in order to conclude that it would be "virtually impossible" for any person to behave in a manner contrary to the way the defendant behaved when the police approached him, specifically, in the present case, by making furtive movements around his waist. Again, the majority's statement has no basis, either in the record or reality.

Each of these fifteen examples represents an instance in which the majority has made factual findings—in many instances based on speculation. In thus expanding the scope of appropriate review and usurping the proper role of the trial court, the majority almost certainly ensures that some of its conclusions will rest in part on sheer factual error or unsupported inferences. This is patently unacceptable, particularly in cases—such as the present—that are of constitutional dimension.

Having outlined the proper parameters of the standard of review, I now address the defendant's substantive claims and the majority's treatment of them. I first discuss whether the Appellate Court properly concluded that the record was inadequate to review the defendant's claim, raised for the first time before the Appellate Court, that he was seized when Mercado allegedly gave him a verbal command to stop. Both the majority opinion and the defendant assert that the existing record is sufficiently developed to review this new claim. The state counters that the Appellate Court was correct to find the record inadequate due to the defendant's failure to develop his claim at the suppression hearing, the absence of Mercado's testimony, and the conflicting testimony offered by Morales and Lawlor. I would conclude that the Appellate Court properly determined that the current record is insufficient to review the defendant's claim with any reasonable degree of accuracy. *State* v. *Edmonds*, supra, 151 Conn. App. 770.

The majority begins by deciding outright—despite providing no factual analysis of the circumstances of the alleged verbal command—that the defendant was seized when Mercado ordered him to stop. Only then, *after already deciding the defendant's claim that he was seized at that moment*, does the majority consider whether the claim was even reviewable in the first place. The majority's approach, whereby it reviews whether it may review a claim after already deciding the claim, defies the most basic notions of our well developed jurisprudence. I am also seriously troubled that the majority reverses the decision of the trial court on the basis of its conclusion that the trial court incorrectly resolved a claim that the defendant never brought before the trial court, and, therefore, on which the trial court made no factual findings.

As the defendant did not initially raise this claim at the suppression hearing, this court should review the unpreserved constitutional claim only if it satisfies all of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see *In re Yasiel R.*, 317 Conn. 773, 775, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). Although this court has a strong interest in reviewing unpreserved claims of constitutional import, if the record is "insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or recon-

struct the record, or to make factual determinations, in order to decide the defendant's claim." *State* v. *Golding*, supra, 240. We have "consistently . . . declined to grant *Golding* review to fourth amendment claims wherein the predicate factual record was not completely developed before the trial court." *State* v. *Jenkins*, 298 Conn. 209, 230, 3 A.3d 806 (2010).

Upon my review of the record, I would conclude that the Appellate Court properly determined that the defendant's claim did not warrant *Golding* review. *State* v. *Edmonds*, supra, 151 Conn. App. 770. The majority suggests that the defendant's claim that he was seized upon Mercado's command to stop *was* raised at the suppression hearing because the defendant asked the trial court to determine when he was seized and "framed the issue more broadly," and the trial court asked Morales to clarify who first made verbal contact with the defendant. The other one half of the majority's equation, however, is missing: the defendant never articulated that claim when specifically asked by the trial court to clarify his theories as to when the seizure occurred. Rather, defense counsel clearly stated that the theory of the defense was that the defendant was seized when the cruisers pulled into the parking lot or, in the alternative, when he was ordered to submit to a patdown.

As a result of the claim never having actually been raised, neither the defendant nor the state introduced evidence to develop this issue and, consequently, the trial court's findings of fact do not address when, if, or how Mercado told the defendant to stop. Additionally, because Mercado was unavailable at the time of the suppression hearing and therefore never testified, the record is devoid of Mercado's own account of what he actually said or did when he allegedly commanded the defendant to stop. Neither of the claims that the defendant raised at the suppression hearing hinged on Mercado's actions or words. Although the prosecutor indicated that he initially had wanted Mercado to testify, after informing the court that Mercado was unavailable, the prosecutor moved on to his examination of Lawlor. Nothing in the record reflects that either party felt Mercado's testimony was indispensable to resolve the defendant's claims.

Additionally, the testimony of Morales and Lawlor regarding Mercado's actions is contradictory. Morales testified that Mercado verbally ordered the defendant to stop. Conversely, Lawlor testified that it was Morales who first verbally engaged with the defendant. As this particular detail was irrelevant to the defendant's claims that he was seized when the officers pulled into the parking lot or when Morales performed the patdown, neither party sought to reconcile the contradiction or examine the officers further in order to precisely determine Mercado's actions. Indeed, after Lawlor made the

contradictory statement on direct examination, defense counsel extensively cross-examined Lawlor on a plethora of topics—the police report of the incident, Bridgeport's loitering ordinance, the exact logistics of how the officers approached the defendant—yet never once questioned him on his facially contradictory statement. Neither party subsequently used the contradiction in their arguments before the court nor did the court itself even make a finding of fact as to who first spoke to the defendant.[1] Thus, the contradiction was clearly unimportant to both the parties and the trial court. As the Appellate Court noted, the defendant easily could have filed a motion for articulation pursuant to Practice Book § 66-5 in order to request that the trial court make findings on Mercado's alleged verbal command, but he did not do so. *State* v. *Edmonds*, supra, 151 Conn. App. 771. Likewise, the majority—rather than annexing the fact-finding province of the trial court—could have remanded the case to the trial court and requested that it make the factual findings necessary for us to resolve the defendant's claim.

Because the parties never developed the testimony concerning the verbal command, the record currently before this court contains no information on exactly which officer gave the command, what the officer actually said, how he said it, the tone of voice in which he issued the command, where the officer was standing in relation to the defendant when he gave the command, whether the officer beckoned or gestured to the defendant while issuing the command, or whether the officer demonstrated a show of authority beyond that of his inherent authority as a law enforcement officer. Such information is pertinent to this court's analysis of whether the verbal command constituted a seizure of the defendant. On the current record, however, the feasibility of such an inquiry is severely curtailed, if not rendered practically impossible. See *State* v. *Jenkins*, supra, 298 Conn. 230.

In an attempt to circumvent the mandate of *Golding* that this court may not review constitutional claims when the record is inadequate; *State* v. *Golding*, supra, 213 Conn. 240; the majority, in addition to broadening the standard of review, appears to advance the theory that a verbal command issued by a police officer is an indisputable seizure. The majority's talismanic, bright line approach is an anathema to this court's search and seizure jurisprudence, which has always held that the question of whether a defendant has been seized must be reviewed under the totality of the circumstances. See *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *State* v. *Burroughs*, supra, 288 Conn. 844–48. Certainly, there may be cases in which a verbal command, under various circumstances, will amount to a seizure. See *United States* v. *Mendenhall*, supra, 446 U.S. 554 (relevant factors include "the threatening presence of several officers,

the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled"); *State v. Benton*, 304 Conn. 838, 844, 43 A.3d 619 (2012) (verbal command may constitute seizure, but only "in view of all the circumstances surrounding the incident"); but see *United States* v. *Taverna*, 348 F.3d 873, 878–79 (10th Cir. 2003) (that police officer "hollered" and shouted command did not amount to seizure of defendant).

I also observe that both on this point and throughout, the majority relies to a vast extent on authorities from our sister courts in other jurisdictions, despite the body of on point, applicable case law established by this court's previous decisions. Merely because we do not have a previous case that is directly, factually analogous to the present case does not mean that we have an absence of authority to govern our decision. To be sure, it is often helpful for this court to examine case law from our sister courts, particularly when confronted with an issue of first impression or a split in authority. See *State* v. *Berrios*, 320 Conn. 265, 284–292, 129 A.3d 696 (2016) (conducting survey of federal and sister state case law to resolve inconsistency in this court's jurisprudence). The court is not faced, however, with such circumstances in the present case. The majority openly acknowledges that there "is no Connecticut authority directly on point" to support its result, and rightly so, because our own case law supports a result contrary to the majority's. See *State* v. *Burroughs*, supra, 288 Conn. 846–49. The majority's use of case law from other jurisdictions in order to arrive at a result that is unsupported by our own prior decisions is simply unpersuasive and corrosive of the predictability and stability of our case law.

As I have stated, the record currently before the court is inadequately developed for the purpose of making a determination as to whether the defendant was seized when an officer issued a verbal command. Indeed, the very out of state cases that the majority offers in support of its own position lend support to the contrary: that a verbal command alone is not necessarily a seizure and must be evaluated under the particular factual circumstances of the command. See *United States* v. *Stover*, 808 F.3d 991, 997, 1000 (4th Cir. 2015) (where uniformed police officers blocked defendant's parked car with their cruiser, with its emergency lights activated and spotlight on, officer's verbal command to defendant, who had exited his vehicle with loaded weapon, to return to his vehicle, did not constitute seizure until he submitted to show of authority); *In re Martin H.*, Docket No. B151148, 2002 WL 1732650, *3 (Cal. App. July 25, 2002) (holding defendant was seized where police shown spotlights on him and ordered him to " '[c]ome here' " to parked police cruisers); *Blake* v. *State*, 939 So. 2d 192, 195 (Fla. App. 2006) (recognizing

that police commands may constitute seizure under some circumstances, yet also recognizing that police encounters to determine individual's identity and address—goal of police in present case—is not unlawful seizure). Although the majority insists that its conclusion is supported by case law, a fair and impartial reading of these cases clearly demonstrates otherwise.

Due to what can only be its tacit acknowledgment that the record is indeed inadequate to address this claim, the majority opinion instead premises its conclusion that the alleged verbal command was a seizure on the fact that Morales and Mercado had driven their police cruisers into the Subway parking lot from opposite directions. Although the fact that the police vehicles were present in the parking lot is certainly a factor for this court to consider in its analysis of whether the defendant was seized under the totality of the circumstances, it is not alone dispositive of whether *the verbal command itself* was a seizure. Rather than discussing the actual verbal command—the details of which, of course, are completely unknowable to us based on the record—the majority obfuscates its own analysis by arguing that because the police cruisers had entered into the parking lot, any verbal order after that point was necessarily a seizure. It is curious that the majority devotes such substantial length and depth to the issue of the police cruisers entering the parking lot, especially since the majority itself expressly declines to address the defendant's claim that he was seized upon the entry of the cruisers on the basis that his claim regarding the verbal command is dispositive.[2] See footnote 9 of majority opinion. And yet the majority's analysis is overwhelmingly devoted to the entry of the police cruisers while the professed dispositive claim, the alleged verbal command, is given only the most minimal attention.[3]

Conversely, the Appellate Court concluded that the defendant was not seized until Morales performed a patdown search. The defendant argues that the Appellate Court improperly determined that he was not seized prior to the patdown, either when the officers first entered the Subway parking lot or, as the majority concludes, when Mercado allegedly commanded him to stop. In response, the state asserts that the Appellate Court's determination was correct, given the benign nature of the officers' encounter with the defendant until the time of the patdown search. Because the defendant's claim that he was seized upon Mercado's verbal command is unreviewable on the existing record, my discussion is confined to whether the defendant was seized when he submitted to Morales' patdown search or rather, as the defendant argues and the majority implicitly agrees, when the police initially drove into the two entrances of the Subway parking lot.

Under article first, §§ 7 and 9, of the Connecticut constitution, a person is seized when "by means of

physical force or a show of authority, his freedom of movement is restrained." (Internal quotation marks omitted.) *State* v. *Burroughs*, supra, 288 Conn. 844. In determining whether a person has been seized, this court asks "whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Internal quotation marks omitted.) Id., 845; *United States* v. *Mendenhall*, supra, 446 U.S. 554. This court has recognized, however, that although uniformed police officers are "cloaked with an aura of authority, this [aura alone] cannot, in and of itself, constitute a show of authority sufficient to satisfy the test for a seizure . . . ." *State* v. *Burroughs*, supra, 849. Our decisions have recognized that the investigatory function of the police often requires officers to approach individuals either on foot or in a police cruiser. In light of that recognition, this court consistently has held that "[t]he mere approach by a police officer, either in a police car or on foot, does not alone constitute a show of authority sufficient to cause the subject of the officer's attention reasonably to believe that he or she is not free to leave." (Internal quotation marks omitted.) Id., 849–50; *State* v. *Hill*, 237 Conn. 81, 91, 675 A.2d 866 (1996).

The trial court in the present case made specific findings of fact about the conduct of the police officers in the Subway parking lot on the night of the defendant's arrest. Although all of the officers were in uniform and entered the parking lot in marked police cruisers, nothing in the trial court's factual findings or underlying evidence shows that the officers had activated their cruisers' lights, drawn their weapons, or taken any actions that amounted to a show of authority sufficient to cause a reasonable person to believe that he was unable to leave. *State* v. *Edmonds*, supra, 151 Conn. App. 772–73. As the officers themselves testified, their initial purpose in entering the parking lot and approaching the defendant was to initiate a consensual encounter with him and verify his identity given the history of robberies in the immediate area. Importantly, the trial court found that the actions of the police in the present case were "normal routine, legitimate and good police investigative techniques," rather than a set of unusual circumstances. The majority makes much of Morales and Lawlor's decision to call Mercado for cover prior to entering the parking lot, but calling for cover is, and the trial court found it to be, routine police practice.[4] Nothing in the record demonstrates that the officers physically or verbally restrained the defendant prior to the patdown.

Likewise, no evidence in the record indicates that the officers positioned their vehicles in such a way as to physically block the defendant from departing. Indeed, the officers' testimony demonstrates that after they pulled into the parking lot, the exits were *not* blocked.[5] Additionally, during cross-examination,

Lawlor used photographs of the Subway parking lot to demonstrate where the police cruiser was parked after entering the lot and his indications did not reveal that the cruiser was blocking the exit.[6] On the basis of this testimony and the other evidence before it, the trial court did not find that the cruisers were used to physically barricade the exits from the parking lot. As nothing about the situation would have indicated to a reasonable person that he was not free to depart, there was no seizure. Such a result is consistent with this court's prior decisions under similar facts. See *State* v. *Benton*, supra, 304 Conn. 840–41 (no seizure where police officer stepped into road into path of oncoming cyclist); *State* v. *Burroughs*, supra, 288 Conn. 840, 849–50 (when police officers approached defendant's parked car from opposite sides there was no seizure).

Notably, the defendant in the present case was in the parking lot as a pedestrian rather than a motorist. As the parking lot was not contained by a fence or a wall, a reasonable person traveling on foot would not have felt himself unable to leave because two police cruisers pulled into the exits intended for motor vehicles rather than foot traffic. Given the open, unenclosed nature of the parking lot in which the defendant was standing, the present case is readily distinguishable from the sister state authority on which the majority relies, as those cases all involve instances in which persons or their vehicles were seized in contained areas. See *State* v. *Rustad*, Docket No. 58691-2-I, 2008 WL 555945, *1 (Wn. App. March 3, 2008) (defendant seized where police cruiser partially blocked single exit from parking lot and police officers surrounded defendant's parked car); *State* v. *Allen*, Docket No. 02CA0059, 2003 WL 21276146, *3 (Ohio App. June 4, 2003) (defendant seized where police obstructed sole exit from contained hallway). Accordingly, I would conclude, contrary to the majority's implicit conclusion, that the Appellate Court properly held that the defendant was not seized prior to the patdown.

The law enforcement community and citizens living in crime-plagued neighborhoods will likely meet today's decision with bewilderment and frustration. Indeed, the majority opinion has grave and unsettling public policy implications. In essence, the defendant posits, and the majority agrees, that he was seized when two police cruisers pulled into a parking lot and when a police officer said something indeterminate to him. To characterize such police conduct as a seizure would convert a substantial number of ordinary interactions between the police and citizens into events of constitutional magnitude. The majority's result will adversely impact the "laudable interaction between the officer and citizenry" in the "performance of his duty to guard the public safety and welfare . . . ." *State* v. *Burroughs*, supra, 288 Conn. 854; see also *United States* v. *Mendenhall*, supra, 446 U.S. 554 ("characterizing every street

encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the [f]ourth [a]mendment, would impose wholly unrealistic restrictions [on] a wide variety of legitimate law enforcement practices").

In addition to the detection and prevention of crime, the police perform an important community caretaker function. The desirable social benefits of cooperative discourse between police officers and citizens will be snuffed out by the majority's conclusion that under the routine circumstances of the present case the officers' conduct constituted a seizure. See *Immigration & Naturalization Service* v. *Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) ("not all personal intercourse between policemen and citizens involves seizures of persons" [internal quotation marks omitted]); *State* v. *Clark*, 297 Conn. 1, 10, 997 A.2d 461 (2010) ("[e]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for the purposes of investigating possibly criminal behavior" [internal quotation marks omitted]); *State* v. *Burroughs*, supra, 288 Conn. 853 ("the constitution does not prohibit, or even discourage, healthy, mutually beneficial intercourse between the public and the police sworn to protect them"); *State* v. *Foote*, 85 Conn. App. 356, 361–62, 857 A.2d 406 (2004) (recognizing community caretaker function of police and holding that there was no seizure when police approached stranded motorist to render assistance), cert. denied, 273 Conn. 937, 875 A.2d 43 (2005).

The majority, however, fails to see any such consequences. Although the majority's conclusions are certainly drawn from a legitimate concern for the constitutional rights of defendants, its conclusion that a defendant may be seized merely when two police cars enter a parking lot or when a police officer utters an unknown phrase to a defendant is an impractical and imprudent rule that ignores the reality of police work, particularly police work in those areas inundated with violent crime. Under the majority's conclusion, police will be less likely to initiate consensual encounters with citizens, as such encounters can now easily be transformed into events of constitutional magnitude by the mere act of an officer's approach. Indeed, after today's decision it is difficult to imagine what police-citizen interactions will *not* be considered a seizure. Given the numerous streets, businesses, and parking lots that can be found in any large, urban area, the police will be hamstrung in their ability to thoroughly investigate and prevent crime because approaching a citizen to obtain information could easily evolve into a seizure. In turn, citizens living in dangerous areas will ultimately be less safe and such areas will become fertile soil for the growth of further crime. The majority accurately observes that in areas with a history of strained rela-

tions between the police and citizenry, some citizens may be intimidated by the mere approach of a police officer. But what better way to rectify such a situation than developing a positive dialogue between police officers and the members of the communities that they serve? The majority's take undercuts the possibility of improving police-citizen relationships at the outset.

In his concurring opinion, Justice Robinson responds to my concerns that today's decision will make it more difficult for law enforcement to carry out its investigative duties. If, as the majority concludes and the concurring justices agree, a police officer cannot speak to a citizen without that interaction becoming the equivalent of taking that citizen into custody, then the police will be unable to effectively communicate with local communities in order to investigate criminal activity and gather information while on patrol. In the present case, we have no idea what the police actually said to the defendant and no way of knowing, given the incomplete state of the record. In this regard, the position that Justice Robinson takes in his concurring opinion further underscores the inadequacy of the record and my belief that its inadequacy places the particular question of whether the verbal command constituted a seizure beyond this court's review.

Justice Robinson—joined by every other member of the majority in an ostensible concurrence—also raises a series of legitimate concerns regarding racial profiling and suspicionless police stops. Although I agree entirely with the concerns that his concurring opinion expresses, I note that issues of race are simply not implicated in the present case. I do not understand why the concurring justices find it necessary to raise and exhaustively discuss issues of race when it has no foundation in the established facts of the case. While the issue of racially motivated policing is currently a prominent topic in our national discourse, as Justice Robinson's concurring opinion itself acknowledges, this case "is not the proper place or time" to discuss "complex societal issues" such as those that the concurrence itself raises. See footnote 1 of Justice Robinson's concurrence. The issues of race raised by his concurrence should properly be discussed and debated in the public forum and it is not the role of this court to insert ourselves into that conversation when the parties themselves did not see fit to raise it.

Most importantly, at no point in the history of this appeal did the defendant or his counsel ever allege that the defendant was impermissibly stopped by the police on the basis of his race. In their testimony, the officers stated that when they first observed the defendant, they could only see his silhouette and that he was wearing a jacket. Nevertheless, Justice Robinson's concurring opinion chooses as its starting point that the defendant was stopped because he is a black man, an unfounded

factual implication based on assertions that the majority makes without reference to the record. I have already discussed at length elsewhere in this opinion the utter lack of support in the record for such assertions. The theory that the defendant was the target of racial profiling by the police is yet another outgrowth of the inadequacy of the record in the present case and demonstrative of the factual uncertainties created by the majority's attempt to draw facts from the record that simply are not present.

Contrary to the conclusions of the majority, it is my opinion that the Appellate Court properly concluded that the defendant was seized when Morales performed a patdown of his person. There is no dispute in the present case that the patdown was a seizure: the police had both exerted the authority of their position and physically restrained the defendant. Once the police begin to perform a patdown search, a reasonable person would not believe he was free to disengage with the police and leave of his own volition.

Only after having first determined that a defendant has been seized, this court asks whether the police possessed a reasonable and articulable suspicion that the defendant was engaged in criminal conduct when seized. *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State* v. *Brown*, supra, 279 Conn. 517; *State* v. *Lipscomb*, supra, 258 Conn. 75–76. Thus, an analysis of whether the police possessed a reasonable and articulable suspicion is distinct from our analysis as to when a defendant has been seized. *State* v. *Brown*, supra, 516. Reasonable and articulable suspicion is an objective standard that asks "whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." *State* v. *Torres*, 230 Conn. 372, 379, 645 A.2d 529 (1994). In conducting that inquiry, we recognize that "the totality of the circumstances—the whole picture—must be taken into account." (Internal quotation marks omitted.) *State* v. *Mann*, 271 Conn. 300, 323, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005); see also *United States* v. *Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

In determining whether the police had a reasonable and articulable suspicion, this court has always acknowledged that there are certain circumstances that, while seemingly innocent on their own, may justify a seizure when viewed in conjunction with other circumstances that are present. Thus, while an individual's presence in a high crime area alone is not enough to provide officers with reasonable suspicion, officers need not disregard "the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." (Internal quotation marks omitted.) *State* v. *Ben-*

*ton*, supra, 304 Conn. 848; see *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Likewise, "[n]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." (Internal quotation marks omitted.) *State* v. *Mann*, supra, 271 Conn. 324. Similarly, an individual's attempt to "reach into his pocket or some other place where a weapon may be concealed is a fact that supports a reasonable suspicion . . . ." Id., 325–26. Although the aforementioned circumstances may give rise to reasonable suspicion, we do not require that the police actually observe criminal activity prior to performing an investigative stop, as "reasonable and articulable suspicion can arise from conduct that alone is not criminal." (Internal quotation marks omitted.) *State* v. *Lipscomb*, supra, 258 Conn. 76.

In my view, the established facts in the present case lead unfalteringly to the conclusion that the officers possessed a reasonable and articulable suspicion of criminal activity at the time they administered a patdown search of the defendant. The record reflects that robberies and other violent offenses were commonplace in the area of Bridgeport in which Morales and Lawlor were on patrol. The officers witnessed the defendant standing alone in the shadows of the empty parking lot of a Subway shop that had been previously robbed. Although the officers may have been curious as to why the defendant was present in that location, nothing under the circumstances was at that point sufficient to merit a seizure.

The defendant's own words and actions immediately prior to the patdown, however, provided the police with the requisite reasonable and articulable suspicion. Both the trial court and the Appellate Court found this to be determinative and I would agree with their assessment. The record reflects that once the officers pulled into the Subway parking lot, the defendant began to walk away and make furtive movements around his waist. Lawlor later testified that he was concerned that the defendant may have had a weapon in his waistband. See *State* v. *Mann*, supra, 271 Conn. 325–26. Oddly, the majority frames the entire question of whether the police possessed a reasonable and articulable suspicion sufficient to support an investigative stop through the lens of whether the police possessed a "reasonable and articulable suspicion of gun possession . . . ." This is not the correct standard. The analysis as to whether the police possess the requisite suspicion to support an investigative *Terry* stop does not vary depending on what manner of criminal activity the defendant is suspected of being involved in by the police, but rather on whether the police possessed a reasonable suspicion of criminal activity in general. *Terry* v. *Ohio*, supra, 392 U.S. 21–22.

Despite the lack of testimony or findings of the trial

court supporting its view, the majority discounts the significance of the defendant's movements around his waist by observing that "a typical man's hands hang only a few inches or so below his waist," and "under normal circumstances it is virtually impossible to turn and walk off in such a way that the hands do not appear to come into proximity [with the waist]." This unfounded observation about human anatomy is insufficient to serve as the justification for resolving a constitutional claim. I disagree that we should retailor our prior case law holding that furtive movements around the waist are a factor that may contribute to a reasonable and articulable suspicion; *State* v. *Mann*, supra, 271 Conn. 325–26; merely on the basis of the majority's groundless conclusion that the defendant was merely "adjusting his pants . . . ." Once the officers exited their vehicles, the defendant spontaneously blurted out, " 'I didn't rob anyone,' " while standing next to the Subway shop that had a history of prior robberies. He then told the officers numerous times that he was "embarrassed."

Under the totality of the circumstances, it is clear to me that the defendant's actions and words in response to the police presence provided the officers with a reasonable and articulable suspicion that the defendant was engaged in criminal conduct. Although each factor may be viewed as innocuous on its own, when taken together, the defendant's evasive behavior, furtive movements around his waist, presence in a high crime area at night, and unsolicited statement that he had not committed a robbery were sufficient to paint a portrait of potential criminal activity. See *State* v. *Benton*, supra, 304 Conn. 848–49; *State* v. *Mann*, supra, 271 Conn. 323. In my opinion, the Appellate Court correctly determined that the officers possessed a reasonable and articulable suspicion when they seized the defendant. As the seizure thus falls within constitutionally valid parameters, I therefore, would affirm the judgment of the Appellate Court upholding the trial court's denial of the defendant's motion to suppress. Accordingly, I respectfully dissent.

[1] As mentioned in the portion of this dissenting opinion discussing the standard of review, the majority avoids this problem by making its own credibility and factual determination by resolving the conflicting testimony in favor of the version of events present in Morales' testimony.

[2] In a subsequent portion of this dissenting opinion, I fully address the defendant's claim that he was seized upon the entry of the police cruisers into the parking lot.

[3] In her concurring opinion, the Chief Justice—while agreeing that the defendant was seized "no later than the time at which he was commanded to stop by the police"—disavows the majority's analysis regarding the officers' entrances into the parking lot. Yet, the majority's conclusion that the verbal command was a seizure is ultimately premised on its analysis of how the police entered the parking lot in their police cruisers. In this regard, the concurrence appears to accept the majority's suggestion that a verbal command alone is sufficient to constitute a seizure.

[4] The majority presents the call for cover as if it were part of some irregular, nefarious plot by the police rather than routine practice. Police calling for cover in seemingly harmless situations is routine for good reason. Consider State Trooper Russell Bagshaw who, pulling into a parking lot at night to

investigate a potential burglary, did not call for cover and was shot and killed by a burglar exiting a nearby building. See *State* v. *Johnson*, 253 Conn. 1, 6, 751 A.2d 298 (2000).

[5] The following exchange occurred on cross-examination:

"[Defense Counsel]: Okay. So at this point you're at one entrance, Sergeant Mercado at the other entrance. The entrance or exit, however you want to call it, they're blocked at this point with police cars?

"[Morales]: No, they're not blocked."

[6] The following exchange occurred on cross-examination:

"[Defense Counsel]: Okay. And here is State's exhibit number 3. . . . And to the best of your knowledge do you know where you parked your car if you can tell on that photo?

"[Lawlor]: Approximately in this area here. It's approximate. I'm not going to give you a definite spot. . . .

"[Defense Counsel]: So let the record reflect that the witness pointed to the bottom center of the photograph, approximately, Your Honor. If that may be reflected."

---